23 C.C.P.A. (Patents)

### ROBINS v. WETTLAUFER.

Patent Appeal No. 3586.

Court of Customs and Patent Appeals.
March 2, 1936.

Stephen H. Philbin and John R. Nolan, both of New York City, for appellant.

Fay, Oberlin & Fay, of Cleveland, Ohio (Horace B. Fay, of Cleveland, Ohio, and John S. Powers, of Buffalo, N. Y., of counsel), for appellee.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

GRAHAM, Presiding Judge.

This appeal is from a decision of the Board of Appeals of the United States Patent Office in an interference proceeding, which decision awarded priority to the appellee, Lillian L. Wettlaufer. The essential facts are as follows:

The appellant, Samuel Davis Robins, was an engineer employed during 1925–26 by the Robins Conveying Belt Company, of Passaic, N. J., in the invention, development, and sale of new products. The company had, prior to 1925, been engaged in the production and sale of mechanical screens of various types, especially of the type known and spoken of in the record as two-shaft machines, and had been experiencing mechanical troubles with some of them. On November 23, 1925, the appellant Robins states, he conceived the in-

vention in issue, and at once prepared a model of the same, which is in evidence as Robins' Exhibit 2. There is no doubt about this model being prepared at the time so stated. This model is a single-decked screen actuated by a single shaft transversely disposed beneath the midsection of the screen and actuating the screen by means of two eccentrics with ball bearings. The eccentricity of this model was a little over one-sixteenth of an inch, and there were no counterbalances upon the actuating shaft. Excessive vibration of the screen, while in operation, was counteracted by two leaf springs extending above and parallel with the screen, and attached to the screen by links, at points equidistant from the actuating shaft, one on each side of the screen.

Upon the completion of this model, it was exhibited to officials of the Robins Company, and it was determined to erect a full-sized machine of this type. This conclusion was arrived at early in January, 1926. A description of such full-sized machine was prepared by Robins some time between December 1, 1925, and January 15, 1926, and is in evidence as Robins' Exhibit 4, a portion of which will be hereinafter referred to. A drawing and blueprints of the new machine were also prepared, about the same time. In February, 1926, orders were issued for the construction of this machine and the same was constructed at appellant's factory in Passaic, N. J., and completed in the latter part of March, 1926. This machine was then set up, run, and tested in said factory and in the yard, and was then sent to the field. This machine followed the model, Exhibit 2, in construction, but had the additional feature of counterweighted flywheels, which counterweights were placed opposite to the eccentrics.

After the new screen was so tested, on or about August 7, 1926, it was shipped to the Verplanck plant of the New York Trap Rock corporation, at Verplanck's Point, N. Y., where it was set up to replace a removed screen. It was installed at about the same date and was operated in screening stone there, beginning on the Monday following August 7, 1926. It was thereafter operated at the same plant, at the same work, for approximately one year, without breakdown. In the beginning, some trouble was experienced with the drive, which continued until a direct belt drive was installed, after which no trouble was experienced. From time to time, as needed, new screen cloths were inserted. The work of the screen at this plant was screening a feed of minus 1 inch square opening crushed stone, the feed containing all sizes of minus 1 inch to dust.

The screen was removed in June, 1927, to the plant of the New York Trap Rock Corporation at Haverstraw, N. Y. This machine weighed about 3,700 pounds. It was used at Haverstraw for about six months, under hard working conditions, and was then returned to the Passaic plant of appellant, where it was found to be badly worn. It afterwards disappeared and was probably junked.

Two other machines, constructed in the same manner as the Verplanck machine, were also constructed by the Robins Company in 1927, and were installed in the plant of the Rochester Gas & Electric Company, at Rochester, N. Y. These were double-decked machines, and each weighed 4,100 pounds. They were at once put in operation and at the time of taking testimony on July 30, 1930, were still in operation there.

The party Robins filed his application for patent on April 12, 1927. Patent was issued thereon on December 4, 1928, No. 1,693,940.

The appellee, William L. Wettlaufer, at the time this interference was declared, was president of the Niagara Concrete Mixer Company, of Buffalo, N. Y., which company had developed a line of brick machinery, including concrete mixers and the like. The difficulties of satisfactory screening became apparent to Wettlaufer, according to his testimony, and he began to consider the development of a "thoroughly balanced screen to operate at high speed." Later, the Niagara Company took over from the Simplicity Engineering Company, of Durand, Mich., its plant, assets, plans, etc., for the making of two-shaft screens. This, according to Wettlaufer, was on or about February 10, 1926. Wettlaufer claims to have conceived and reduced to practice the subject-matter of this interference in the summer and fall of 1926. This matter will be hereinafter referred to in connection with the motion to amend the preliminary statement of Wettlaufer. It appears from the record that a single-shaft machine which seems to have answered to the counts of the interference was built in the Wettlaufer plant about the

middle of September, 1926, and was sent to the Pierce plant of the American Radiator Company, at Buffalo, N. Y.

Wettlaufer filed his application for patent on March 31, 1927. On April 17, 1929, he copied certain of the claims of the Robins patent for the purpose of interference.

On May 17, 1929, the examiner declared an interference having three counts. In this interference, on June 17, 1929, Wettlaufer filed a preliminary statement, alleging conception as of February, 1926, a drawing in September, 1926, disclosure in February, 1926, written description on or about September 22, 1926, and construction of a full-sized machine on or about September 20, 1926.

As the result of proceedings under rule 109 of the Patent Office, unopposed by Robins, three additional counts were added to the interference on May 3, 1930. A second preliminary statement was filed by Wettlaufer on May 21, 1930, which repeated the dates given in his first statement.

On January 3, 1931, Wettlaufer filed his motion to amend his preliminary statements by substituting in each of said statements for the date of September 20, 1926, as the date of reduction to practice, the following: " * * * the month of May, 1926, and prior to the 27th day of May, 1926, and as nearly as he can now recollect and ascertain on or about May 24, 1926," and by adding in said paragraphs of each of said preliminary statements after the words "issue of the interference," the following: "which said machine was successfully operated in Buffalo, New York, on or about May 24, 1926, has been successfully operated in Buffalo, New York, at all times since, and is today in successful use and operation in Buffalo, New York." This motion was supported by the affidavits of the appellee, and of Arthur R. Tauffener, Walter P. Geyer, and John S. Powers. The reason given by the appellee in support of his motion is that his preliminary statements were prepared by his attorney, who was said to be unfamiliar with the facts, and that at the time of the preparation of the same it had escaped the recollection of appellee that he had made single-shaft machines in May, 1926. The motion to amend was held, to be decided on final hearing.

All the counts of the interference are taken from the Robins patent, being claims 1 to 6, inclusive, thereof. Counts 1 and 3 are typical, and are as follows:

"1. A screening apparatus comprising a screen frame, a drive shaft substantially coincident with the center of gravity of the said frame, stationary bearings for said shaft, connections between said shaft and frame whereby the frame is positively gyrated in circular paths lying in planes at right angles to the drive shaft, and resilient equalizing means simultaneously acting in the same direction upon said frame beyond the respective sides of the shaft and operative to maintain the said frame constantly in correct screening position while permitting its positive gyration."

"3. A screening apparatus comprising a screen frame, a drive shaft substantially coincident with the center of gravity of the said frame, stationary bearings for said shaft, means, including an eccentric on the drive shaft and a connecting member between said eccentric and the frame, whereby the said frame is positively gyrated in circular paths lying in planes at right angles to the drive shaft, means rotatable with said shaft and adapted and arranged to counterbalance the screen frame, and resilient equalizing means simultaneously acting in the same direction upon said frame beyond the respective sides of the shaft and operative to maintain the said frame constantly in correct screening position during its positive gyration."

Voluminous testimony was taken on both sides. In fact, the testimony is so voluminous as to almost obscure the issues. Much of this was taken on behalf of the appellee, Wettlaufer, in an attempt to prove an earlier reduction to practice and construction of a full-sized machine prior to the date alleged in his preliminary statements.

The Examiner of Interferences held that the appellee had not made a sufficient showing to justify the granting of the motion to amend, and such motion was, therefore, denied, and appellee was held to be restricted to the date alleged in his preliminary statements, namely, September 20, 1926, for reduction to practice. As to the Robins proof, the Examiner of Interferences found that the appellant, Robins, installed a single-shaft screen in the Verplanck plant on August 7 and 8, 1926, which thereafter was operated; that this screen was distinguishable from the prior art by being fitted with stabilizing springs;

and that this was the arrangement which "inventively characterizes the device in interference."

The examiner thus stated this point: "Whether the counts of this interference can be so construed as to read upon the 'Verplanck' screen, it is thought unnecessary to decide. As stated, the novel feature of each of the counts—the equalizing springs and their arrangement in relation to the actuating shaft—is manifestly present in said screen. Since Robins independently invented this novel feature, and the evidence is persuasive that Wettlaufer appropriated this advance of Robins in the art, it seems evident that Wettlaufer is a claimant without right in this interference. Priority, therefore, will be awarded to Robins."

The Board of Appeals took a different view of the matter and held that the examiner was not "justified in disregarding the limitation as to the relative positions of the center of gravity of the screen frame and the drive shaft." As to the motion to amend the preliminary statements, the board agreed with the Examiner of Interferences that no showing had been made which justified such amendment. The board held that the Verplanck machine was not a reduction to practice of the issue of the interference, saying: " * * * We agree with the party Wettlaufer that an examiner probably would not permit any of the counts in issue to be made in an application based upon the drawing of the Verplanck structure, and we do not consider that this structure satisfies the counts. We think that it is immaterial whether the center of gravity refers to the entire gyrated mass or to the screen proper. Our belief is that it is more reasonable to accept the center of gravity of the entire gyrated mass but since this apparently is conceded to have been over 7 inches from the drive shaft in the Verplanck structure, we regard this as clearly too far away to fall within the scope of the counts."

Priority was, therefore, awarded to Wettlaufer. From that decision, Robins brings the case to this court for review.

■ Attention must first be directed to Wettlaufer's motion to amend. We have gone through the record with care and are not convinced that Wettlaufer had the invention in his possession or constructed any single-shaft machine embodying the subject-matter of the invention prior to September, 1926. The record made by himself and his witnesses is uncertain, full of conflicts and contradictions, and some of the witnesses are impeached on material points. Such testimony is not at all satisfactory, and if the right to amend depended upon the strength of the same, it does not appear that Wettlaufer's motion should prevail. The burden rested heavily upon Wettlaufer to show by clear and convincing evidence that he was the real inventor of the device in issue at the time claimed in his amended statement. Methudy v. Roy, 65 F.(2d) 171, 20 C.C. P.A. (Patents) 1142. Without going further into the record, which both tribunals in the Patent Office, especially the Examiner of Interferences, have exhaustively examined and discussed, it is sufficient to say that we do not find that Wettlaufer has sustained this burden. His motion for leave to amend was based upon the alleged fact, as stated in his affidavit, that he did not recollect the earlier single-shaft machines claimed to have been made in May, 1926. However, as pointed out by the Examiner of Interferences, his oral testimony is contradictory of this; Wettlaufer stating that he thought the May machines did not satisfy the counts, as they did not have flywheels. As flywheels do not constitute elements in the counts of the interference, this reasoning is not satisfactory.

Wettlaufer's motion to amend was made on January 3, 1931. As to this, the Examiner of Interferences states:

" * * * Notice by Wettlaufer that a motion to amend his preliminary statements would be presented was given in the Robins record on December 3, 1930. This notice, however, came after the direct examination of the party Robins, and after this party had been cross-examined for a period of approximately six days and to the extent of over six hundred cross-questions, the case to be made out by Robins having then, of course, been thoroughly outlined. The notice also was subsequently to a four months' recess (August 6 to December 3, 1930) in the taking of Robins' testimony.

"The first preliminary statement of Wettlaufer, directed to counts 1 to 3, was filed June 17, 1929, and his second, directed to counts 4, 5, and 6, added to the immediate interference as the result of favorable action upon a motion under Rule 109 by Wettlaufer, unopposed by Robins, was filed May 22, 1930. Hence, an in-

terval of nearly eighteen months separates the filing of his first statement, and his notice in the Robins record, and an interval of over six months said notice and the second statement of Wettlaufer."

The record substantiates these findings.

Both tribunals in the Patent Office concurred in finding that the amendment should not be allowed. We find nothing in the record which will justify a contrary conclusion. As was said in Chapman v. Hammett, 53 App.D.C. 236, 289 F. 634, 635: "Each of the tribunals of the Patent Office found that, upon the facts alleged, Chapman was not entitled to amend, and, in view of the fact that such a question is largely within the discretion of those tribunals, we see no reason for differing with them."

Our holding on this subject, as announced in Methudy v. Roy, supra, was followed and further developed in Duemler and Koeln v. McCabe, 67 F.(2d) 911, 21 C.C.P.A. (Patents) 772.

We therefore concur in the view expressed by both tribunals below, that Wettlaufer must be restricted to September 20, 1926, for a date of reduction to practice.

This conclusion leaves, apparently, but one principal question to be answered, namely: Was the Verplanck machine of Robins a reduction to practice of the issues of the interference? If it was, Robins had conceived and reduced to practice before Wettlaufer had entered the field, and hence Robins is entitled to priority. If not, as is conceded by counsel for Robins in oral argument, Wettlaufer must prevail. No prior conception, with diligence from the time immediately before Wettlaufer entered the field until Robins filed or otherwise reduced to practice, is alleged by Robins. In fact, Robins shows no conception, except what was expressed in his model, Exhibit 2, and the Verplanck machine. Robins' case, therefore, must stand or fall upon the Verplanck machine.

The Board of Appeals was of opinion that the Verplanck machine did not satisfy the counts in so far as it did not have "a drive shaft substantially coincident with the center of gravity of the said frame," as stated in counts 1, 2, 3, 4, and 5, or "close to the center of gravity," as stated in count 6. It is conceded by counsel for both sides that there is no patentable distinction between "substantially coincident with" and "close to," as they appear in

these counts. Assuming the correctness of this concession, without passing thereon, the case will be so considered.

In determining the question as to whether the Verplanck machine satisfies the counts, the principal controversy is as to the location of the actuating shaft in that machine. That it was located midway between the ends of the screen frame is not questioned. However, the appellee contends that it was not located "substantially coincident" with the *center of gravity* of the *frame*. There is some dispute as to whether the "center of gravity," spoken of in the counts, should be applied to the live frame only, or to the entire gyrated mass. The Board of Appeals inclined to the belief that it was more reasonable to apply it to the gyrated mass. Robins testifies that the actuating shaft in his Verplanck machine was located 7.1 inches away from the center of gravity of the gyrated mass. Appellee's witness Parks estimates it at 7.44 inches. The witness Parks also estimates the distance of the shaft from the center of gravity of the live frame at 10¾ inches.

When the party Robins entered the field in 1925, his object was to produce a screen which would operate at a reasonably high speed and would be balanced and thus be free from unnecessary vibration, noise, and wear. It must also be assumed that he was acquainted with the state of the art, and that, in the prior art, similar screens had been operated with a single actuating shaft, such as Adrianson, 1,565,883, Babka, 1,448,181, and many other references found in the record, and had been counterbalanced with springs, such as in the references above named and many other references of record herein. The use of eccentrics was also well known at that time in such devices to produce a vibratory action.

Some time before the middle of January, 1926, Robins prepared a written description of his invention, in which he thus described the location of his actuating shaft: "The screen frame will be actuated by two eccentrics mounted on a single eccentric shaft running across and beneath the screen frame nears its mid-section."

As to his springs and eccentrics he said:

"Two leaf springs, mounted on either side and above the screen frame, at right angles to the eccentric shaft, will be link

connected to screen frame, each at two points. The springs will be centrally supported by a cross beam fastened to the base.

"Each half of each spring may be considered as a cantilever spring acting upon $\frac{1}{4}$ of the whole screen frame, and the calculations for determining the spring design will be worked out on this basis.

"The eccentricity will be $\frac{1}{2}''$ so that springs will be deflected $1''$ on each revolution of the eccentric shaft."

This was the combination of elements which constituted Robins' conception and which he then thought was inventive, in view of the prior art. No intimation was given in this description, or in the drawings, or to the assistants who built the Verplanck machine, that the center of gravity of the frame or gyrated mass was important or being considered. The problem was to get a balanced screen. It was afterwards, when the Verplanck screen was being built, that flywheels with counterweights or counterweighted shafts were conceived and added to the prior conception, to accomplish the more perfect balancing of the machine. Such counterweights do not appear upon the model, Robins' Exhibit 2.

When this machine was installed and operated at the Verplanck plant, it operated successfully and accomplished the purpose for which it was constructed, namely, screening material without the release of destructive vibrations. It was used for long periods, both at the Verplanck and Haverstraw plants. The witnesses Robins, Hogan, Tomlins, Pos, Reid, and Conover testified that they saw the machine running, and that it worked well, smoothly, without unnecessary vibration, and that the orbit of its rotations was practically circular. Kelleher, superintendent of the Verplanck plant, in charge of the machine, testified to the same facts, and that the machine gave entire satisfaction.

The only evidence to the contrary to which our attention has been directed is that of Professor George B. Upton, professor of experimental engineering at Cornell University, Albert E. Fielding, and Walter J. Parks, the two latter being in the employ of the Niagara Concrete Mixer Company. These three witnesses, in January, 1931, examined two screens which the Robins Company had built in 1927, and had installed in the plant of the Rochester

Gas & Electric Company, four years before, and which had been in operation there during the whole of that period. These machines were double-decked, and much heavier than the Verplanck machine. These witnesses testified, in general, that there was much excessive vibration and noise in the operation of these screens; that the orbits of their rotation were not circular, but irregular; and that they were inefficient. Professor Upton deduced from observation of those machines the conclusion that much of the unnecessary vibration was caused by the distance between the actuating shaft and the center of gravity, which he said was nine inches. In giving his testimony, Professor Upton stated, among other things, the following:

" * * * My impressions might be summarized in a statement of belief for which I am too poor a mathematician to give proof by analysis of this complicated problem, that the smaller the diameter of the eccentric circle, the easier will be the practical problem of maintenance of circular paths of motion in all parts of the live frame, understanding, that with the change of the diameter of the eccentric circle the speeds are changed so that the same accelerations are had at all combinations. * * *

"Q88. In your answer to Q87, you mentioned various possible errors of assumption in finding the corresponding speeds or calculating the rock center distances. Will you mention the unknowns out of which these errors of assumption might arise. A. The rock center distance will depend upon the stiffness of the springs. In this regard I had to assume that the stiffness of the springs is the same in the Rochester and Verplanck machines and corresponds with regard to weight of live frame to the springing of the model. At high speeds the springs have only a minor effect. The diameter of the eccentric circle will cause a change in the rock distance, it being more difficult to maintain the circular motion if the diameter of the eccentric circle is increased while other factors are maintained. constant. * * * * "

Robins called as a witness on this subject Professor Richard F. Deimel, associate professor of mechanics of the Stevens Institute of Technology and consulting engineer. Professor Deimel had examined and made a study of a screen made by the Robins Company, a duplicate

of the Verplanck machine, and which was in operation at Passaic, N. J., in June, 1931. After manual and instrumental tests, this witness found the balance of this duplicate machine to be "satisfactory," and without "appreciable" vibration. This witness also, in other respects, differed from Professor Upton in his conclusions. As to the balancing of screening machines, he stated:

"Q35. Prof. Upton has also stated that as to the Robins' model, Exhibit 2, the Verplanck machine, and the Rochester machine perfect balancing was impossible. What have you to say about that? A. I agree with Prof. Upton that perfect balance ·is impossible, but satisfactory balance. can certainly be obtained. * * *

"Q36. And what do you mean by satisfactory balance, Professor? A. By satisfactory balance I mean balance without objectionable noise, appreciable shaking of the frame, or interference with screening action. I am sure that Prof. Upton will agree with me that perfect balance is never obtained in practice. A Ford engine is satisfactorily balanced, but certainly not perfectly balanced. * * *

"A. If all paths are true geometrical circles all points have the same simultaneous accelerations. Any distortion of these true circles into elliptic paths is due to the superimposed oscillation or rocking of the screen. This adds to the violence of the agitation, and unless it is excessive—in which case the screen would obviously not be used—it must add to the effectiveness of the screening rather than to detract from it. * * *

"A. Good screening depends upon the ratio of the centrifugal acceleration to that of gravity. This ratio need not have any fixed value but may vary within comparatively wide limits. Therefore, any motion that makes the acceleration a little larger or a little smaller than that of the actuating center can have no detrimental effect because the screening action is not critical. Limits within which the acceleration would vary were stated I believe in the testimony of Mr. Parks. * * *

"Q44. Now, it has been testified on behalf of Wettlaufer in this case that the center of gravity of the single-deck Niagara screen is four inches away from the eccentric center and that the machine known as the American Radiator machine, Wettlaufer Exhibit 24, has the center of gravity one-half inch away from the eccentric center; that in the Robins' Rochester machine it is nine inches away; in the model, Robins' Exhibit 2, it is five-eighths inches away; and that in the Verplanck machine it was 7.44 inches away. Now I will take as an example in this instance the American Radiator machine in which the center of gravity is one-half inch away, and the Verplanck machine in which the center of gravity is 7.44 inches away from the actuating center; and I ·show you photographs of the American Radiator machine, Wettlaufer Exhibit #W 26, showing the orbits of the paths of motion of that machine, and I also show you enlarged photographs taken from the small photographs produced by Wettlaufer, and will ask you to compare the orbits of motion illustrated .in these photographs of the American Radiator Company machine with the orbits of motion of this model, Robins' Exhibit 87, and the photos of the Verplanck machine, Robins' Exhibit 86, and state whether or not there is any perceptible difference in the circular paths of these two machines and whether or not there would be any difference in the operation of those two machines for screening purposes as the result of any difference between the center of gravity and the actuating center? * * *

"A. Before answering this question I would like it to be understood that whenever I speak of "good screening" or the "efficiency of screening" I mean only in so far as screening depends upon acceleration; I am not familiar with the proper size of mesh and rate of feed for screening and I understand that the question at issue depends only upon acceleration of the screens.

"The photographs and the orbits described by the model, Exhibit 87, .which has just been run at 700 R.P.M., are all elliptical and do not appear to have widely different proportions. The proportions of the ellipse do not depend exclusively on the distance to the center of gravity. Other elements influence the orbits such as moment of inertia, mass, spring strength and points where the springs are attached, and so on. From the standpoint of acceleration I am confident—in fact, sure —that all these screens would operate with the same result. * * *

"Q47. So far as the balancing of these machines is observed, what if any appre-

ciable effect do a few inches more or less off the center of gravity from the eccentric center have? * * *

"A. My answer to Q47 is that there is no perceptible difference."

It will thus be seen that there is a disagreement between the experts as to the effect which will be produced by a departure of the shaft from the center of gravity of such a device. However, the overwhelming weight of the testimony is to the effect that the Verplanck screen worked without unnecessary vibration, and this circumstance, it is thought, should have great weight in determining whether the actuating shaft was mounted in *substantial* coincidence with the center of gravity of the frame.

The conduct of the parties after the production of the Verplanck screen throws much light on the construction to be given to the counts of this interference. In the fall of 1926, the appellee, in copartnership with Louis Wettlaufer and Lewis E. Soldan, and associated with the Niagara Concrete Mixer Company, exhibited a two-shaft screen at a machinery show at Toronto, Canada, in which screen the two shafts were connected and synchronized by a train of gears. This Toronto show was in the latter part of August or first part of September, 1926. According to the witness Soldan, the plan was to send this machine from the Toronto show to a foundrymen's show at Detroit, Mich., which was to be held later in September, 1926. In the month of August, 1926, one Adolphus T. Hamer, acting as a sales agent for the appellee, in company with the witness Soldan, called at the Verplanck quarry of the New York Trap Rock Company. At that time Hamer was driving a car with a trailer, on which was mounted a two-shaft screen made by appellee, and for which Hamer was attempting to take orders. Both Hamer and Soldan saw and examined the Verplanck machine installed by appellant, at that time. In his deposition in this record, Hamer states that upon his return to Buffalo he did not tell appellee of the single-shaft machine of Robins, which he had seen. However, the record shows that on Sunday, February 15, 1931, Hamer made a written and signed statement to Robins and his counsel, material parts of which follow:

"Mr. Hamer went with Wettlaufer June, 1926 to sell screens as an agent and left him late in August, 1926, because he could not make any money due to Bill Wettlaufer's policy because he couldn't sell the two shaft chain connected screen. Made one trip to Verplanck, New York, to New York Trap Rock Company and saw Gent. Had two shaft machine on a trailer. Gent was interested. Made second trip in August, 1926, but thinks Gent was away. Had Lewis Soldan with him second trip. Also at this time went out on Long Island. Soldan and Hamer were there together on second trip and Soldan measured up to see about putting in two shaft machines. Shipped I beams to Verplanck to put two shaft machine on them. Hamer now lives in Toronto. Bill Wettlaufer did not go down there at any time while he was with him. Remembers he saw a different screen there that ran faster than the others. First trip was in July to Verplanck, last trip was in August latter part when Sol was with him and did try to get him make a single shaft machine, probabilities were they discussed single shaft screen with Wettlaufer and different sizes but he would not make it. * * *

"Sure he saw a single shaft spring suspended screen at Verplanck in August, 1926, and Wettlaufer at that time had not made a single shaft machine. Summer 1930 at Millerouche, Ontario, first saw Niagara single shaft machine which party said was a good machine, but which Mr. Hamer said was now but was not when he was selling them."

Again, on February 15, 1931, Hamer made another such signed written statement, in which he said:

"Standing in front of the single shaft spring hung Robins screen at Verplanck, Soldan and I discussed the screen. He criticized something about the way the springs were connected with the spring frame. We also noticed the plain grease lubricated bearings. Soldan said ball bearings were the only thing that would do and I said no roller bearings were best.

"After that trip Soldan and I returned to Buffalo and talked to Wettlaufer about different things. I don't remember myself talking to him about that Robins screen. In fact I don't think I did because whenever before that time I mentioned Robins to Wettlaufer he never liked to discuss them. He had at that time the idea in his mind of going after the coarse screening end where Robins were established and

he intended to do the coarse screening with the same machine he was then building."

On February 24, 1931, Hamer wrote appellant Robins a letter, a part of which is:

"Since I returned home, I have been looking through some records I have which indicate that I was in error in regard to some of my evidence given you in Buffalo on Sunday, February 15th instant. I find that after I returned to Buffalo from my first trip through New York State in July 1926 that I came on to Toronto the next day and did not return to Buffalo until the same day that I left for New York on my second trip. This fact is fully established from records I have in regard to cash paid out wherein the date was marked on. Such being the case, I know now that the discussion I had with Mr. W. L. Wettlaufer regarding your screens at Verplanck, N. Y. took place before July 17th, 1926 and also that I was not at the American Radiator Plant after either of my trips to New York. Both visits to this plant took place prior to July 17th, 1926.

"As I have had time to recall what took place that time, I have been able to fix dates for certain occurrences as I mentioned before from records of cash which I paid out. I consider that it is only fair to all parties that these corrections should be written into my evidence and I would suggest that you forward me a copy of my evidence and allow me to revise it and have it as nearly correct as possible, or in case that should be an impossibility at this date to at least incorporate into my evidence this letter."

The witness Soldan testified that he and Hamer saw and thoroughly examined the Verplanck machine in August, 1926, and that upon their return to Buffalo, they fully explained this single-shaft machine to Wettlaufer. Immediately thereafter, construction of a full-sized single-shaft machine was begun in Wettlaufer's building by his employees, Emiel Soldan, Hugh Morrison, and Lewis Soldan. This was about the middle of September, 1926. Shortly thereafter a small single-shafted "Junior" model was constructed for the forthcoming foundrymen's show in Detroit. This large single-shaft machine was completed and sent to the Pierce plant of the American Radiator Company at Buffalo, N. Y., and was there operated. This is the machine which is held by the office to constitute a reduction to practice by Wettlaufer herein. That it satisfied the counts of the interference herein is not denied by appellant. When the machine was installed, it replaced a Wettlaufer two-shaft machine previously installed. The eccentric shaft in this machine was located about one-half inch away from the center of gravity.

Soon thereafter the appellee began the commercial production of the single-shaft type of machine in two grades, the standard and junior. As produced and sold, these screens were described in a circular sent to the trade. According to Wettlaufer, the screens so circularized were within the issues of the interference. As to the center of gravity, he says: "A. On the junior model the axis of the shaft from the center of gravity of the single deck screen is approximately four inches from the center of gravity. On the triple deck, the dimension is approximately three and three-quarter inches; on the standard models the single deck dimension is approximately four and a quarter inches, whereas the triple deck is approximately three and a half inches."

Wettlaufer contends that a copy of one of these circulars, alluded to as a "broadside," and a circular letter accompanying the same, were sent to appellant's company, and that this spurred appellant into activity, and that the idea of having the shaft coincident with the center of gravity was conveyed to Robins by this "broadside." This circular and letter discloses one-shaft, spring-mounted, one, two, and three screen machines, but make no disclosure as to the coincidence of the actuating shaft with the center of gravity. Nothing was disclosed therein which did not appear in Robins' Verplanck screen. The circular and letter were received by the Robins company on January 7, 1927.

When Wettlaufer filed his application for patent on March 31, 1927, nothing was stated in either his specification or claims relative to the position of the actuating shaft as to the center of gravity of the frame. His specification stated that the object of the invention was to obtain a "screen-mounting which shall balance the loaded screen so perfectly * * * as to avoid injurious or destructive vibration of the machine or building." It is true, the

drawings show a centrally located shaft, but how far it is from the center of gravity can only be conjectured.

In an amendment to his specification filed by Wettlaufer on June 15, 1928, he stated, in part:

"The balancing of the screens does not depend wholly upon placing the shaft centrally of them, but also upon counter-balancing the eccentric portions 17 of the shaft 14 which positively transmit the shaking motion to the screens. As shown in Figure 3, this is accomplished by making the central or intermediate portion of the shaft in the form of an eccentric or distributing the weight thereof in such manner that it is counter-balanced relative to the driving eccentrics 17, this intermediate eccentric portion being indicated at 14a and being located on the opposite side from said driving eccentrics. Ordinarily this counter-balancing of the shaft is sufficient to properly balance the screen so it will not shake itself to pieces or unduly shake the building, if screening conditions were always uniform.

"It sometimes happens, however, that in a two or three-decked screen, only one of the screens is desired for use. The removal of one screen will unbalance the machine to a certain extent and something must be provided to meet such varying conditions. I accomplish this end by preferably mounting counter-balancing wheels 27 on the shaft 14 between the bearings 16 and 17 and providing such wheels with radially-adjustable weights 28 which are held in a set position by bolts 29 and which may be conveniently placed at different distances from the axis of the shaft to nicely balance the screen, in accordance with the number of screens used or to the load. By this construction and by locating the counter-balancing wheels as shown, they are disposed outside of the screen where they are easily accessible for adjustment."

It was only after the examiner had cited reference patents having centrally located single actuating shafts that Wettlaufer, on December 5, 1927, amended his specification and claims to show the feature of the coincidence of the center of gravity and the actuating shaft.

The Robins application, filed April 12, 1927, contained the following statement of the objects of his invention:

"The principal object of my invention is to overcome the objections mentioned in a screen of the class referred to, by the provision of simple and efficient screen operating mechanism, including eccentric and spring connections which are co-operatively related to effect and maintain the dynamic balancing of the apparatus under all working conditions.

"Another object of the invention is the provision of means whereby the angle of the screen surface can be readily and quickly adjusted while the screen is in operation, and this without impairing the balance of the apparatus."

As to the center of gravity, the specification recites: "The upper side plates 27 of the live frame have formed therein, midway between the ends of the structure, openings 35 through which the hollow shaft 23 extends. This shaft is firmly fastened to the live frame by means, for example, of complemental clamp sections 36 (Fig. 7) which tightly embrace the hollow shaft and are bolted to the adjacent side plates. Therefore the gyratory motion of the hollow shaft is positively imparted to the live frame and all points of the latter are given a true circular motion in paths lying in planes at right angles to the drive shaft; and, since the actuating center of the shaft coincides with the center of gravity of the frame, the inertia of the latter as a whole does not set up moments about the actuating center; it being obvious that if the actuating center were away from the center of gravity of the screening element, such moments would be set up and would influence the paths of motion described by all points of the live frame. Such a motion of this frame, being a compound motion, is impossible to counterbalance effectually, with the result that the escaping vibrations would be disastrously transmitted to the supporting structure."

From this recital of the facts, it is quite apparent that the primary conception of both parties was to construct a single actuating shaft screen which would be evenly balanced and free from destructive and noisy vibrations. This was to be accomplished by a combination of features—a centrally located actuating shaft, springs to offset and counteract vibratory and unbalancing forces, and weights to counteract eccentric action. All these features were embraced within the Verplanck machine of Robins, and the great weight of the credible testimony seems to be that these ideas were obtained by

Wettlaufer from the examination of this machine by the witnesses Hamer and Soldan, and appropriated by him. The principle involved in the feature of a coincidence of the center of gravity with the actuating screen, at first not appreciated by either party as essential, was discovered through efforts to avoid references in the prior act. So far as this last element of the inventive combination is concerned, this record fails to show that either of the parties obtained that element from the other.

■ It therefore remains only to determine whether the Verplanck screen, with its actuating shaft removed from its center of gravity as it was, was "substantially coincident" or "close to" the center of gravity of the screen. In considering this point, it will be borne in mind that the consideration of a reduction to practice of the invention must include all elements of the combination which constitute the invention. Of these, the element of the coincidence of the actuating shaft and center of gravity is but one. This limitation cannot be ignored, but it must be considered with the other elements of the invention. In view of all the elements constituting the subject-matter of the invention, was the actuating shaft substantially coincident with the center of gravity?

In *Union Paper Bag Machine Co.* **v.** *Murphy*, 97 U.S. 120, 125, 24 L.Ed. 935, the Supreme Court, in an infringement case had this to say: "Except where form is of the essence of the invention, it has but little weight in the decision of such an issue, the correct rule being that, in determining the question of infringement, the court or jury, as the case may be, are not to judge about similarities or differences by the names of things, but are to look at the machines or their several devices or elements in the light of what they do, or what office or function they perform, and how they perform it, and to find that one thing is substantially the same as another, if it performs substantially the same function in substantially the same way to obtain the same result, always bearing in mind that devices in a patented machine are different in the sense of the patent law when they perform different functions or in a different way, or produce a substantially different result."

In *Eibel Process Co.* v. *Minnesota & Ontario Paper Co.*, 261 U.S. 45, 43 S.Ct. 322, 67 L.Ed. 523, claims of a patent, in describing the factor of pitch, defined it *only by the words "substantial" and "high."* The Supreme Court held that the claims were not indefinite because of failure to disclose, but remarked that it was well within the knowledge of those versed in the arts to determine what was the substantial pitch needed, and that the successful use of the pitch for the purposes of accomplishing its aims by the trade was convincing proof that one versed in the art could find in the specification all he needed to know to avail himself of the invention. In this case there was a variation between 6 inches and 15 inches in elevation, and the test applied was whether the elevation of 15 inches was a substantial elevation with respect to the objects *to be accomplished by the invention.*

In Valvona-Marchiony Co. v. Marchiony, 207 F. 380, the District Court of the District of New Jersey had before it a patent containing a claim which, in part, recited: "All the heat absorbing and conducting sides of the mold being of substantially the same thickness." In construing this claim the court said: "'Substantially' is a relative word, which, while it must be used with care and discrimination, must nevertheless be given effect. The patent demanded that uniformity of thickness of metal, and that only, which would necessarily tend to secure the equal heating and consequent uniform baking of the pastry in the mold."

Again, in Engineer Co. v. Hotel Astor et al., 226 F. 779, 780, the District Court of the Southern District of New York was considering the second claim of a patent which recited: "The method of regulating furnaces which consists in maintaining in the furnace chamber a pressure substantially equal to atmospheric pressure under varying rates of combustion." The court stated: "Much discussion has occurred over the word 'substantially,' used in the claims and specifications of the patents. I find no difficulty in understanding what the patentee means. He wishes to avoid any appearance of professing ability to maintain exactly atmospheric pressure in the combustion chamber. He wishes also to produce certain economies and superiorities of which a pressure near that of the atmosphere and nearly constant is the sign or symbol. Therefore the word 'substantially' as used in the patents means so near to atmospheric pressure as to pro-

duce and maintain the economies and superiorities sought after, and merely illustrated by the phrase 'substantially atmospheric pressure.' "

In Pittsburgh Iron & Steel Foundries Co. v. Seaman-Sleeth Co. (D.C.) 236 F. 756, the court held that the word "substantially," in a claim of a patent, cannot be given the same meaning as "essentially."

In Hazeltine Corporation et al. v. A. H. Grebe & Co., Inc. (D.C.) 21 F.(2d) 643, 645, in an electrical patent, a claim recited the connection of an auxiliary coil and a coil "with a coefficient of coupling substantially equal to unity." The court observed that the defendant wound his coils interleaved, which was the closest possible coupling which could be obtained with coils of the defendant's type, "and is effective as unity coupling would be, and is substantially equal to unity." The defendant contended that "substantially equal to unity" meant as close to unity as it was physically possible to get. The court did not coincide with this view, stating that to give the language of the claim such an interpretation would be to ignore the word "substantially" of the claim, and, at the same time, would destroy the whole significance of the claim.

■ We conclude, therefore, that it cannot successfully be contended here that "substantially coincident with" or "close to" means "coincident with" or "at." To so hold would be to destroy the claims of the patent. If the actuating shaft be close enough to the center of gravity of the frame so that the objects of the invention are accomplished and its proposed new and useful results attained, then the shaft may be held to be "substantially coincident" with the center of gravity.

■ Whether this be true can only be ascertained in the actual operation of the device. In the case before us, we are convinced that the greater weight of the credible evidence shows that the Verplanck machine successfully operated to produce the new and useful results of the subject-matter of the counts of the interference, and that it satisfied the same, and that the element which is the issue in this case contributed to that result. The party Robins, therefore, should be awarded priority.

The decision of the Board of Appeals is reversed.

Reversed.