34 C.C.P.A. (Patents)

### Application of CURLEY et al.
### Patent Appeal No. 5204.

Court of Customs and Patent Appeals.
Dec. 9, 1946.

BLAND, Associate Judge, dissenting in part.

Harker H. Hittson, of Columbus, Ohio, for appellants.

W. W. Cochran, of Washington, D. C. (R. F. Whitehead, of Washington, D. C., and Harold B. Whitmore, of Chapel Hill, N. C., of counsel), for the Commissioner of Patents.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, JACKSON, and O'CONNELL, Associate Judges.

HATFIELD, Associate Judge.

This is an appeal from the decision of the Board of Appeals of the United States Patent Office affirming the decision of the Primary Examiner rejecting all of the claims (Nos. 1 to 4, inclusive) in appellants' application for a patent for an alleged invention relating to an improved ventilator or blower for use in underground mines, and particularly in "gaseous mines."

Except as hereinafter noted, claims 2 and 3 are illustrative of the appealed claims. They read:

"2. In a ventilator, the combination with a ventilator housing, of an electric motor positioned within said housing and comprising end bells secured to the motor frame and supporting journal bearings for the motor armature shaft, one bell being closed and the other open, a streamlined cover for the open end bell, means supporting said motor spaced from the inner wall of said housing, an air impeller driven by said motor and adapted to force air through said housing and outside said motor, a controlling switch for said motor positioned adjacent thereto, means for securing said cover to the motor frame to form in cooperation with said closed end bell an enclosure for said switch, and actuating mechanism extending from outside said ventilator housing through the forced air path and connected to operate said controlling switch.

"3. In a fan, the combination with a generally cylindrical outer housing through which air is to be forced, of a motor within said housing, means supporting said motor spaced from the inner wall of said housing, an impeller driven by said motor and adapted to force air along a path between the exterior of said motor and the interior of said housing, mechanism coacting with the frame of said motor to form an enclosure, a motor controlling switch disposed adjacent one end of said motor within said enclosure, and actuating mechanism for said switch extending from outside said housing, through said air path and into the enclosure for said switch, said actuating mechanism having means for op-

erating it outside said housing thereby to control said switch."

The references are:

Burgess, 1,725,897, August 27, 1929.
Schmidt, 1,932,231, October 24, 1933.

It was the purpose of appellants to provide a compact ventilator or blower of light weight which could be moved from place to place in a gaseous mine to supply clean air to so-called "working faces that are usually dead ends."

It was also the purpose of appellants to provide a ventilator or blower with the motor and its moving parts, together with a controlling switch which is placed adjacent the motor, in a complete enclosure so as to prevent sparks from the motor or switch coming into contact with the gas in the mine and causing explosions or fires. The controlling switch adjacent the motor is operated by means of a rod which extends through the casing which encloses the motor and the switch and through the forced air path between the casing and the housing, thence through the housing to the outside of the device.

Appellants state in their application that their ventilator is provided with a rotary fan which causes a flow of air to pass through the motor and over the switch for the purpose of preventing undue heating of the various electrical elements. That feature of appellants' device, however, is not included in any of the appealed claims.

It will be observed from quoted claim 3 that the motor and the controlling switch therefor, are placed in an enclosure. Claim 4 calls for a similar arrangement.

Claim 1 calls for a motor and a controlling switch therefor in a "substantially complete enclosure."

Claim 2, as we read it, is broader than the other appealed claims in that it does not expressly call for the motor being in an enclosure, although the claim calls for the switch being adjacent the motor and within an enclosure.

The patent to Burgess relates to an electrically operated lavatory dryer, evidently used for the purpose of drying the hands by warm air applied thereto. The patentee discloses a device in which the motor and the controlling switch therefor are in a housing which is not completely or substantially closed.

In the Primary Examiner's statement to the Board of Appeals it is said that the switch in the Burgess disclosure is operated by a rod which extends through the housing.

The patent to Schmidt relates to a "propeller type fluid translating apparatus" or blower which may be used either for gaseous or liquid media. The motor is enclosed in a housing which has apertures or openings to provide ventilation for the motor.

In rejecting the appealed claims, the Primary Examiner stated that although a switch for operating the motor was not disclosed in the patent to Schmidt, there was undoubtedly one located at some point, probably remote from the motor, to control its operation; that all appellants have done is to locate the switch in the conical fairing member of the Schmidt blower; that the Schmidt device and appellants' device "operate in the same way regardless of the location of the switch;" that to operate the Schmidt blower with the switch located in the conical fairing member, an operating rod for the switch must necessarily pass through the housing; and that, therefore, it would not involve invention "to place the Burgess switch in the Schmidt device, and pass the operating rod to the outside."

Although the examiner stated that the motor and the switch in appellants' apparatus were completely enclosed, and that the patent to Schmidt disclosed openings to provide ventilation for the motor, *he did not hold that it would be obvious to close those openings in the Schmidt device in order to provide a complete enclosure for those elements.* On the contrary, the examiner stated that the openings disclosed in the Schmidt device "would be advantageous even in applicants' device, since without them there would be no path for the air otherwise circulated by" the fan in appellants' device to cool the motor.

In affirming the decision of the Primary Examiner, the Board of Appeals stated that

counsel for appellants stressed the fact that there was no communication between the motor and the switch in appellants' device and the atmosphere in a gaseous mine, whereas the Schmidt device had openings in the housing which permitted electrical sparks to come into contact with the atmosphere in a gaseous mine. The board held, however, that "* * * none of the claims require that there be no apertures in applicants' cover, and therefore the claims do not appear to definitely include this feature." The board further stated that it agreed with the views expressed by the Primary Examiner that in view of the disclosure in the Burgess patent, there would be no invention "in placing a motor switch within the fairing member of Schmidt and providing an operating member therefor accessible at the exterior of the conduit or duct or in closing one of the end bells."

In its decision, in response to a request for reconsideration of its original decision, the board stated:

"We are not in agreement with applicants that a *complete enclosure* or an enclosure that is substantially complete *may not be an enclosure having apertures or is restricted to a housing or covering that is completely closed*. In this connection it is noted that according to the specification the motor cooling fan * * * is necessary when the housing is completely closed to the outside and that such cooling means are omitted from the claims. This seems significant as to possible asserted interpretations of the claims in the future, if allowed." (Italics ours.)

Accordingly, the board affirmed its original decision rejecting the appealed claims.

It will be observed that, in its second decision, the board stated that it was not in agreement with counsel for appellants *"that a complete enclosure or an enclosure that is substantially complete may not be an enclosure having apertures or is restricted to a housing or covering that is completely closed."* (Italics ours.) In other words, the board stated that a *complete enclosure* may not be one that is *completely closed,* and that an enclosure that is *substantially complete,* as called for by appealed claim 1, may not be a *complete enclosure.*

It is argued here by counsel for appellants that the Board of Appeals was in error in holding that the claims on appeal do not call for the motor and switch adjacent thereto to be "enclosed" as that term is used in the art here involved, and that, by the use of the term "substantially enclosed" or "enclosed," the appealed claims require that there be no apertures for ventilation or other purposes in the parts of appellants' device which enclose the motor and the motor switch.

In support of his contentions, counsel calls attention to Electrical Engineers' Handbook, Pender-Del Mar, 3rd Edition, Vol. IV, published in 1936, Sec. 16, page 28, wherein it is stated:

"Coal Mines. Most of the operations in coal mining have been electrified in one way or another. Some of the electrified equipment, such as cutters and locomotives have motors which form an integral part of each unit, and there is seldom, if ever, any occasion for the mine operator to consider what type of motor is needed. On the other hand, there are a number of drives, such as for tipples and breakers, ventilation, pumping, and dumping, and hoisting, where data concerning the type of motor which should be used are frequently needed. *A further point of importance is that, in gaseous mines, all motors and controls must be fully enclosed so that there will be no danger of sparks setting off an explosion. Motors specially designed for this service are on the market."* (Italics ours.)

Our attention is also called to Sec. 16, page 14, of that authority, where it is stated:

"Totally Enclosed Air-Jacketed Motors. Several of the leading manufacturers are building motors which are *totally enclosed* and ventilated and fan cooled. They are designed for locations where dust, fumes, and moisture are present in sufficient quantity to clog, corrode, short-circuit, or wear out the *open type* or where inflammable dust or vapors are present in sufficient quantity to cause explosions or fires. In some cases *enclosed motors* should be used throughout the plant, and in others only in locations where conditions make them

necessary. Obviously the use of such motors is more satisfactory in the long run than providing improvised unventilated boxes for their protection or placing them in a separate room or building.

"Where Used. The following brief analysis gives an idea of the services to which motors of this type may be applied. It is worth bearing in mind that insurance rates in hazardous locations are lower where *enclosed air-jacketed motors* are used and that they are furthermore of advantage in that they act as a safeguard against loss of production, not covered by insurance, in atmospheres where there would be danger of fire or explosion with *open-type motors,* even when boxed or partitioned." (Italics ours.)

■ It appears from the quoted excerpts from the Electrical Engineers' Handbook that completely enclosed motors for use in gaseous mines are referred to as "enclosed motors," as distinguished from so-called "open-type motors." There is nothing in that authority to suggest that a *substantially enclosed motor* is one that comes within the term "completely enclosed motor." On the contrary, the term "enclosed motor" has reference to a *completely enclosed motor.* We are of opinion, therefore, that the term "enclosure" contained in appealed claims 3 and 4, which call for the motor and the controlling switch to be within an enclosure, should be interpreted, contrary to the views expressed by the Board of Appeals, to mean a complete enclosure, in accordance with the meaning of the term "enclosed," as used in the art here involved.

■ It will be observed that there is no reference in the quoted excerpts from the Electrical Engineers' Handbook to the location of the controlling switch for enclosed motors for use in gaseous mines. Whether there is invention in placing a controlling switch adjacent an enclosed motor so that both elements are enclosed, in view of the disclosures in the references relied upon by the tribunals of the Patent Office, when considered in the light of the statements contained in the quoted excerpts from the Electrical Engineers' Handbook, is not an issue before us, as the jurisdiction of this court is confined to the grounds of rejection applied by the tribunals of the Patent Office and to the "points set forth" in appellants' reasons of appeal. In re Oliver M. Tucker and William A. Reeves, 54 F.2d 815, 19 C.C.P.A., Patents, 810.

■ It is evident from what has been said that locating the controlling switch disclosed in the patent to Burgess in the Schmidt blower, where the motor is enclosed within a housing which has openings therein to provide ventilation for the motor, would not prevent sparks from the switch or motor, or both, from coming into contact with the atmosphere in a gaseous mine. It is clear, therefore, that such a combination would not produce appellants' device, or the improved results obtained thereby. Accordingly, we are of opinion that appealed claims 3 and 4 are patentable over the references of record.

■ As hereinbefore noted, claim 2 does not expressly call for the motor being within an enclosure. We are of opinion, therefore, that that claim was properly rejected on the references of record.

■ Appealed claim 1 calls for a motor and a controlling switch therefor in a "substantially complete enclosure." The word "substantially" does not necessarily have the same meaning as the word 'essentially." It is a relative term and should be interpreted in accordance with the context of the claim in which it is used. See Robins v. Wettlaufer, 81 F.2d 882, 23 C.C.P.A., Patents, 952.

In view of the intended purpose of appellants' improved blower, we are of opinion that appealed claim 1, which calls for the motor and the controlling switch therefor to be within a "substantially complete enclosure," is sufficiently broad to include a device which is not restricted, as stated by the Board of Appeals, to a housing or covering which completely encloses the motor and the controlling switch, and that, therefore, that claim does not define patentable subject matter over the references of record.

For the reasons stated, the decision of the Board of Appeals is modified, being

affirmed as to appealed claims 1 and 2, and reversed as to appealed claims 3 and 4.

Modified.

BLAND, Associate Judge (dissenting in part).

I cannot concur in the allowance of claims 3 and 4.

The dispute between the applicants and the Patent Office rests upon the question as to whether or not appellants' ventilator is enclosed, and probably in some respects the Patent Office decisions are subject to some criticism.

Be this as it may, ever since coal mines were electrified it has been one of the oldest expedients to arrange their electrical devices so that sparks should not come in contact with gas. The reference, Electrical Engineers' Handbook, is particularly pertinent. If it is conceded that appellants' device, or any part of it, is completely enclosed, in my judgment it would not amount to invention, in view of the art cited, to enclose it.

It is difficult for me to see just how appellants completely enclose the elements of their device and at the same time provide a fan to run the air through to cool their motor. But even if they have some way of doing it, if any invention is present it would be in the manner in which they did it and not in the broad principle of completely enclosing a motor.

It is noted that in the opinion of the majority it is definitely held:

"*Accordingly, we are of opinion that appealed claims 3 and 4 are patentable over the references of record.*" [Italics mine.]

Upon the instant record, it cannot properly be urged that affirming the board's decision for lack of invention over the instant references is stating a new ground of rejection. Both tribunals of the Patent Office rejected the appealed claims upon the two references. They are in the instant record, and we should not so limit our jurisdiction as to be unable to affirm a rejection upon references which clearly show there is no invention and thus be responsible for the issuance of a patent that is wholly invalid on its face.

In re Wagenhorst, 64 F.2d 780, 20 C.C. P.A., Patents, 991, is no authority for a conclusion that upon the instant record, by reason of an alleged unsound statement by the board, an invalid patent must issue, and certainly the Tucker and Reeves case referred to in the opinion of the majority is not in point for the reason that there we held that we could not substitute a wholly new ground for rejecting a claim but were confined to the reasons applied below and brought to our attention in the reasons of appeal. In the instant case there is no question but that the claims were rejected upon the references of record.

Of course, by statute we are confined to a summary review of Patent Office decisions on the points set up in the appeal and must not apply new grounds of rejection not considered by the Patent Office. It is no new ground of rejection to say that in view of the references of record it is not inventive to do what appellants have done regardless of whether the claims are construed to mean partly enclosed or wholly enclosed.

It may be urged that the commissioner, under his supervisory authority, has the right to again pass upon the patentability of the claims in view of the majority's instant holding. It is hardly likely that the commissioner would hold the claims unpatentable after reading the statement from the majority opinion which I have above quoted.

While it must be acknowledged that our jurisdiction, under the statute as we have construed it in the case cited by the majority, is a very narrow one, it is my view that if it is narrowed further by a ruling such as is made here our appellate procedure should be radically changed.

The language of the pertinent statute in mind is more than one hundred years old, enacted at a time when there was no provision for a proceeding under section 4915, R.S., 35 U.S.C.A. § 63, as there is today. It is my hope that Congress may see fit to provide, in the event section 4915 remains on the statute books, that appeals to this court and comparable proceedings in the District of Columbia courts will be

made to work more in harmony and involve substantially the same procedure.

It is unfortunate, to my way of thinking, that an appellant may appeal here and get an invalid patent because the Board of Appeals gave the wrong reasons for rejection whereas if he moves under section 4915 the trial judge is empowered to say there is no invention and deny the applicant's claims. This is an anomaly that should be legislatively cured and I am not intimating that we can do anything about it.