## MOSS v. PATTERSON-BALLAGH CORPORATION et al.

Civ. No. 5572.

United States District Court,
S. D. California, C. D.

Feb. 21, 1950.

Joseph F. Westall and Edward F. Westall, Los Angeles, for the Plaintiffs.

Lyon & Lyon by R. E. Caughey, Los Angeles, for the Defendants.

WEINBERGER, District Judge.

This cause arises under the patent laws of the United States; the original complaint was filed by Perry M. Moss, as inventor and patentee, against Patterson-Ballagh Corporation, as the alleged infringer, for damages, etc., for infringement of Letters Patent No. 2,190,880. Since the filing of that complaint, Perry M. Moss has assigned to Phoebe E. Moss, his wife, all his right, title and interest in and to said Letters Patent, including the right to recover for past infringement of said patent, and Byron Jackson Co. has acquired the assets of Patterson-Ballagh Corporation and has assumed any liability of said Corporation. Appropriate amendments have been made to the pleadings.

The device described in the patent in suit, as well as other devices used or manufactured for similar purposes, have been designated variously in the pleadings and evidence as "draw works line guide or controller", "wire line guide", "line controller", "wire line spooler" and "spooler"; for this memorandum we will call all of said devices "spoolers" unless another of said names is used.

The Moss Letters Patent were issued to Perry M. Moss on February 20, 1940, after application filed January 21, 1938.

The defendants have stated they are manufacturing their spoolers under a license agreement with J. E. Reed, whose Letters Patent No. 2,238,398 were issued April 15, 1941, after application filed May 22, 1937.

At the trial of the case plaintiff Phoebe E. Moss appeared and testified on behalf of plaintiff; Perry M. Moss was unable, because of illness, to appear, and his testimony was presented by deposition; in addition to these witnesses, plaintiff called seven men of long experience in the operation of oil wells, none of whom appeared to have an interest in either the Reed or Moss patents.

Defendant offered the testimony of J. C. Ballagh, president of Patterson-Ballagh Corporation, and Vice-President of Byron-Jackson Co., a man of long experience in the manufacture and sale of oil well tools, Allen E. Hambly, expert witness, patent attorney for defendant Byron-Jackson Co., J. E. Reed, licensor of Patterson-Ballagh Corporation for the use of the Reed Patent, and E. F. Prehoda; Reed and Prehoda were also men of long experience in the operation of oil wells.

The evidence shows that a standard oil well derrick is usually about 100 feet high, with the height on a slant of 122 feet, and with a 24 feet square base, inside measurement. A winding drum is placed on one side of the derrick floor, and from this drum runs a wire line or cable, which unwinds upward to the derrick top where it passes over appropriate mechanism and downward to the hole. On the end of this line is attached the drilling or other heavy

tool; as the tool is run in the cable unwinds from the drum and as the tool is pulled up the cable winds on the drum. As the number of layers of cable helices increase or decrease on the drum the slant of the line will vary consequently; the rapid rotation of the winding drum will cause considerable vibration or wave motion to be produced in the cable, causing successive waves to travel up and down the span; these waves, due to the weight of the cable and the rapidity of the winding motion of the drum cause a lateral motion of the cable of considerable extent sufficient to result frequently in the cable "jumping" the drum, and to prevent its normal winding up neatly, or being spooled neatly upon the drum. The vibrations of the cable were designated by witnesses experienced in oil well drilling operations as "the whip of the line."

Early attempts were made to control these vibrations by the use of various devices, including that known as a "chain spooler."

Such device consisted of a piece of chain which had three to six links and with the wire line being threaded through a central link. A rope or wire line was tied to each end of the chain and each of said lines was threaded through a pulley from which the line hung down toward the floor of the derrick, with a counterweight attached to the end. This type of spooler was not successful. It eliminated some of the vibrations, but the chain caused the wire drilling line to wear out rapidly, and sparks flew from the contact of the wire with the chain, thus creating a danger to the workers on the rig.

The Moss device and the alleged infringing device have operated successfully to check vibrations so that the line is spooled neatly, friction on the drilling line is reduced for longer wear, and the hazards of operation theretofore present removed.

A model to scale of the device made by plaintiffs under the Moss patent is Exhibit No. 4, and it was introduced into evidence installed in a model derrick, Exhibit No. 3.

A model to scale of one of the alleged infringing devices manufactured by defendants is Exhibit N.

The device shown in the Moss patent, the device shown in the Reed patent and the alleged infringing device are of similar construction except that the defendants' device and the Moss device show an eye at the top for attaching a hanging line, or suspension line, while the Reed patent shows an eye in the longitudinal center for a hanging line. The spooler originally manufactured by the defendants is similar to that shown in the Reed patent; there is no contention by plaintiffs that this device, with the eye for the hanging line in the middle, infringes their patent.

Counsel in their argument have stated, and the Court agrees, that the Reed application shows each and every element of the Moss patent, except that in the Moss patent the suspension, or hanging line of the spooler is attached to an eye at the top instead of, as in the Reed patent, an eye at the middle, or longitudinal center. Counsel are also agreed that the question before us is whether Moss' hanging line at the top constitutes invention.

The Moss patent describes a spooler which consists of a semi-cylindrical shell of metal in two sections, joined along one side, and openable. Inside the shell are a series of aligned, spaced, semi-cylindrical blocks of rubber having an axial bore slightly larger than the drilling line or cable, and through which said line passes in winding or unwinding from the drum. Each bearing block is small compared to the length of the shell and is separately replaccable by opening the shell; from opposite sides of the shell are V or elbow arms (17) of metal whose divergent ends are rigidly attached to the top and bottom of the device on each side; the convergent ends of each of these arms is completed by a bar (18) of V-shape telescoped in the arm pipe ends, and secured. This bar provides the place of attachment through which are attached "harness bridles" or lines (15) and (16) on each side, which are rove over guide pulleys attached in the derrick; the ends of these lines hang over the outside of the derrick on each side, and equal weights are suspended from them.

An eye (17a) on the upper limb portion of each of the V arms (17) is shown, "for

the attachment of suspending lines if such an arrangement is more adaptable to given cases of operation."

An eye (13) is affixed at the top of the shell "and to this eye is attached \* \* \* the suitable suspending element" the upper end of which is attached up in the derrick. This we call the "hanging line".

The patent further recites that the hanging line is secured in such a position in the rig that the suspended shell will be in a position to "axially coincide" with the slanting line running from the top pulley to the drum, "that is so that the shell and the cable line have a common coaxial position tangent to the drum." The patent further recites:

"In other words, the draw-line shell is hung with its center of gravity on the axis of a given line and with its axis normally, that is while free, substantially coincident with the axis of the introduced cable body. in such position the shall is balanced to tilt in a vertical plane on a transverse axis through its center of gravity and does not impose noticeable resistance on the line to hold its own obliquity."

The Reed patent describes a similar, openable shell lined with similar rubber blocks, similarly replaceable; the V arms (17) of the Moss patent have their equivalent in Y cables connected through radially extending ears two at the top (one on each side) (31), (32) and two at the bottom (33), (34). These cables at their convergent ends meet on each side by being attached to a ring (38) and from these rings, on each side, extend cables which similarly are disposed over pulleys to hang with an equal weight on each cable end, outside the derrick.

An eye or ear, (28), "preferably located centrally with respect to the length of the housing member" receives one end of a supporting cable, "by which the spooler may be freely suspended from the derrick".

The Reed patent further recites:

"As will be hereinafter more fully described, it is necessary that the cable be permitted considerable latitude of motion in the direction of the longitudinal axis of the winding drum, so that the line of cable may be wound in a series of coils or a helix along the face of the drum and hence the guide or spooler constructed in accordance with my invention must be adapted to allow free movement of the cable in this direction. For this purpose I prefer to suspend my spooler or guide upon a relatively long length of cable, in the assumed example described herein the spooler being preferably suspended approximately 40 feet upon the winding drum upon a cable which is approximately 40 feet in length \* \* \*. By suspending the spooler at its approximate longitudinal center, it will be apparent that the spooler will hang freely with its longitudinal axis disposed in substantial alignment with the direction of the extent of the span of the cable and will not require a bend or offset of the cable as it passes through the spooler."

The Moss patent contains 9 claims, but while the complaint charges infringement generally of the patent, counsel for plaintiffs have stated that there is no contention that infringement has been committed except as to claims 2 and 7 of the Moss patent.

Claim 2 reads: "A draw works drum line controller body having an elongate, line receiving bore, a pair of opposite lateral control devices each including parts diverging toward the opposite ends of and connected to said body to stabilize it against vibration on its minor axis in the plane of said devices, and a suspension means connected to said body at a point eccentric to the major axis and adjacent to one end of the body to support the body in normal position with the bore substantially parallel and contiguous to the line for reception thereof substantially without load of the body on the line when this is in a vertical plane transverse to the axis of the draw works drum."

Claim 7 reads: "A draw line control apparatus including a shell structure, bearing means mounted in the shell, means for suspending the shell to receive and pass the said draw line, bridle means extending toward opposite sides of the shell, and oppositely directed arms rigidly secured to the shell and to which the said bridle means are respectively connected; said suspend-

ing means including a device hitched to the shell at a point eccentric to its bore to cause the shell to hang at a desired angle from the vertical; and said shell consisting of elongate opposed sections, and band parts secured to said sections and having connected hinge eyes at one side of the shell and opposed lugs for fastening means at the opposite side of the shell."

The Reed patent contains 3 claims. Claim 2 of the Reed patent is as follows: "In a guide for damping vibrations in a long span of traveling cable, a housing member including a pair of complementary semi-cylindrical elongated housing members, each having longitudinally extending flanges thereon, by which said members may be assembled together, lining means for said housing defining a restricted longitudinal bore through said guide, through which said cable may freely travel, means on at least one of said housing members near the longitudinal center thereof by which said guide may be suspended for substantially free lateral movement with respect to the direction of travel of said cable, and guy means associated with said housing for restricting the lateral movement of said guide."

The Reed file wrapper, showing the application for the patent and further proceedings in the Patent Office, was introduced in evidence as Plaintiffs' Exhibit 11; the Moss file wrapper as Plaintiffs' Exhibit 12.

The file on the Moss patent shows that correspondence was had between the Patent Office and counsel for Moss over a period of about 2 years; that other patents and applications were considered, including the Bell, DePeel, Gill, Swan and Sawtelle patents; the file on the Reed patent also shows references to the patents last above named, as well as others.

It appears from the Reed file that after the allowance of the Moss patent, and on June 4, 1940, while the Reed application was still pending, the present counsel for the defendants, who represented Reed in his application, communicated with the Patent Office, wherein they asked that Reed be permitted to amend his application to include Claim 23, as follows: "—23. A draw works drum line controller body having an elongate line receiving bore, a pair of opposite lateral control devices each including parts diverging toward the opposite ends of and connected to said body to stabilize it against vibration on its minor axis in the plane of said devices, and a suspension means connected to said body at a point eccentric to the major axis to support the body in normal position with the bore substantially parallel and contiguous to the line for reception thereof substantially without load of the body on the line when this is in a vertical plane transverse to the axis of the draw works drum. —"

The communication further stated that the amendment had been copied from Moss patent, claim 2 thereof, except that the amendment omitted the recital that the suspension means is connected "adjacent to one end of the body." It was requested by said counsel in said communication that an interference be declared between applicant's claim 23 and Moss patent claim 2, and it was stated: "On April 17, 1940, assignee of the present application received a notice charging infringement by the device of this application of the Moss patent, and an interference proceeding appears to be the proper mode of determining any issue of priority that may exist."

The file also shows the reply of the Patent Office to the communication above mentioned, wherein the Patent Office stated in part:

" * * * Therefore proposed claim 23 presented by applicant without the limitation 'and adjacent to one end of the body' in reference to the position of the 'suspension means' omits a relevant part of claim two of Moss and upon which the last 5 lines of function in claim 2 depends. Applicant's device as disclosed in this case has no suspension means adjacent to one end of his body but provides his suspension means at the center of his body. The function in the last 5 lines of claim 23 is not accomplished by applicant's device and is not disclosed in this case * * *."

" * * * claim 2 of Moss is considered to be patentably different from proposed claim 23. * * *."

No appeal was taken from this decision of the Patent Office.

The evidence is that Perry M. Moss, in his work in the oil fields, for many years experienced trouble with the whipping of the line, and finally conceived the idea of his spooler; that on or about May 16, 1936, he related in detail his idea for a spooler, as later shown by his model in evidence, to A. M. Anderson, who was in charge of production for the Holly Oil Company, Moss' employer; that later he showed Anderson some sketches of his spooler; about November 22, 1936, Moss obtained some materials from a Mr. Terry who was employed at the same well as Moss, and from these materials, Moss constructed a full-size spooler similar to that shown in the model; Mrs. Moss, his wife, assisted him in laying it out, but most of the work was done by Moss at home in his garage. About November 25, 1936, Moss showed the shell of the spooler to Mr. Terry, and Terry later saw this spooler installed in a well.

The first test of the spooler after its completion was made in a well of the Holly Oil Company, under the supervision of A. M. Anderson, on April 5, 1937, at Huntington Beach, California. The Court takes judicial notice that Huntington Beach was, at that time, and had been for many years previous thereto, the center of great activity in the oil well drilling industry, and that said city is about 34 miles from Los Angeles, California.

Moss stated in his deposition that he had not secured a test of his spooler prior to April of 1937, because after he completed it in the latter part of November, 1936, he wanted to wait until he had an opportunity to test it in a well under the supervision of someone with whom he was acquainted, where he would get a fair deal.

Another test of the Moss spooler was made in a well of the Republic Petroleum Company at El Segundo, California, in July or August of 1937.

Several witnesses employed on the respective wells where the tests were made gave clear evidence to the effect that the spooler was hung at the top in the manner shown by the model of the Moss spooler and derrick and that the spooler operated successfully.

The required statutory notice was placed upon the devices manufactured and sold by plaintiffs under said patent, and on April 17, 1940, plaintiffs gave notice to defendants of plaintiffs' charge of infringement.

With reference to the history of Reed's invention, he testified that he had used chain spoolers as late as 1935, which chains he suspended in some instances by two ropes tied upward to a girt in the derrick, and in other instances by a loop about eight feet above the chain with a line from the top of the loop to a girt up in the derrick; that in 1935 he constructed a light wooden spooler, about 18 inches long, and this spooler was suspended from its top to the third girt above in the derrick, by two lines; another spooler of wood soaked in oil was similarly suspended. None of these spoolers were successful; the chain caused sparks, the wood wore out too quickly, and caused dust to fly; in March of 1936 he tried out a rubber spooler, but used no suspension means.

In April of 1936, he made an affidavit of invention, Exhibit D, witnessed by Mr. Prehoda, a man who worked with Reed; this affidavit showed a spooler with rubber inserts, side bridles, weights, but had no suspension line; a short slack line was attached to the derrick, the line being designated a safety line "to prevent the dropping of the spooler should the counterweight ropes break." This invention was turned over to Reed's employer, Union Oil Company, and was released to Reed in January, 1937. The next spooler made by Reed, according to his testimony, was one of pipe split longitudinally, with rubber inserts, side bridles and counterweights, and a slack or hold down safety line which was attached to the rig below the spooler. The pipe was bolted together with a bolt on each side at the top and a bolt at each side at the bottom. Reed testified a suspension line was made by tying a piece of rope from the bolts on each side at the top, then another rope from the center of this loop, which rope led upward and was attached to the third girt of the derrick

above the spooler; this spooler was used on Belridge No. 20, a well of the Union Oil Company, in July of 1936. A sketch of this spooler, as testified to by Reed was drawn by him, and is Exhibit B.

Reed constructed another spooler in August of 1936; and drew a sketch, Exhibit C, to illustrate this device; he stated it was made of pipe, had rubber inserts, side bridles with counterweights, and bolts at the top and bottom on each side. As a suspension means, Reed testified he used a loop with each end fastened on the top bolts on each side of the spooler; a pulley was placed in the center of the loop, and from this pulley a single line went up to the third girt above the spooler, where another pulley was attached; from the second pulley, the line went down outside the rig, and on the end of the line was a counterweight; a slack or hold down line was attached to the bottom of the spooler.

Reed testified that this spooler last made took most of the whip out of the line.

Mr. Prehoda corroborated some of Mr. Reed's testimony concerning the use of the Reed spoolers, but was evidently confused between the "suspension" means and the "safety line." While Reed testified that the safety line was attached to the bottom of the spooler, Prehoda testified that the safety line was attached to one of the eyes at the top of the spooler and the other end of this line was attached 45 feet up in the derrick. Mr. Prehoda also testified concerning the first Patterson-Ballagh spooler he saw and stated that this spooler had a "safety line" from the center eye of the spooler and attached 21 feet above the spooler to the derrick. Both Reed and Prehoda testified that the Patterson-Ballagh spooler was suspended by two lines tied to the top eyes of the spooler to form a loop over the top, from the center of which loop a line went up to the third girt above the spooler.

Reed testified that he never heard of Mr. Moss until 1944, and never saw one of his spoolers until 1947. Reed further stated that he first installed one of the Patterson-Ballagh spoolers like the one pictured in Exhibit H, in a well in July of 1937; that

he hung this spooler on a line attached to the center of a loop made by tying each end of a rope through the ears at the top on each side of the spooler; that the middle eye was used for attaching a safety line.

Reed further stated that he hung the Patterson-Ballagh spooler in this manner, in July of 1937, instead of from the middle eye, because that was the normal way to hang anything to have it hang perpendicularly; that his previous wooden spoolers had been hung in such a manner and that the chain spoolers were also tied from the top; that when he hung the Patterson-Ballagh spooler from the top it functioned to take the whip out of the line.

Mr. Reed also stated that he had no conception of hanging at the top when he made his affidavit of invention in April of 1936, but was interested in the wear of the rubber and in keeping the waves out of the line so as to spool it perfectly.

In January of 1937, Reed conferred with J. C. Ballagh, and learned that Ballagh had, in December of 1936, filed an application for a patent on a spooler; Ballagh became convinced that Reed was the true inventor, and the former withdrew his application, and on May 10, 1937, entered into an agreement for the use of Reed's device as shown in the patent application thereafter filed by Reed. On May 22, 1937, an application identical with that formerly filed by Ballagh was filed with Reed named as inventor, and on April 15, 1941, as heretofore stated, the Reed Letters Patent were issued; Reed has been, since the agreement mentioned, receiving a royalty on the rubber used in the manufacture of defendants' spoolers.

We have no testimony concerning any experiments by Mr. J. C. Ballagh which led to the filing in December of 1936 of his application for a patent on the spooler which was afterwards described in the Reed patent, but it appears that the first one of these spoolers was manufactured by Patterson-Ballagh Corporation in, or shortly prior to June of 1936. A photograph of this spooler was identified as Exhibit H. This spooler, which we will call the first type of Patterson-Ballagh spool-

ers, is in appearance similar to the drawing in the Reed patent; the photograph shows the bridle lines attached, and a line attached to the middle eye, which line is coiled upon the floor near the spooler. Mr. Ballagh stated that three dozen, at the most, of those spoolers were manufactured, and less than two dozen sold. In July of 1936 one of these spoolers was shipped to Bakersfield, California, to the Reserve Oil Company.

Mr. Ballagh testified at one portion of his testimony that the eye was put in the middle of the spooler for the purpose of attaching a safety line to keep the spooler from dropping down in the event the hanging lines would break; in another portion of his testimony, Mr. Ballagh stated that it was not necessary to the spooling of the line that there be any suspension line at all; at another portion of his testimony, Mr. Ballagh stated that the line shown attached to the middle eye of the early Patterson-Ballagh spooler was either a hanging line or a safety line, and that it was called a hanging line in the Patterson-Ballagh advertisements; that a hanging line and a safety line were the same thing.

Mr. Ballagh further related that in 1936 and 1937 he made trips through the oil fields, and received many suggestions from men in the field that the Patterson-Ballagh spooler would operate better if it were hung from the top by two lines, instead of from the middle; that in August, 1936 he visited a well of the Reserve Oil Company and observed the spooler which had been delivered to said Company, and noted that the spooler was suspended from two hanging lines at the top of the spooler, with no line attached to the middle eye; that he took a photograph of the spooler as it appeared in the rig, which photograph is Exhibit K.

An examination of Exhibit K discloses one of the first type of Patterson-Ballagh spoolers; side bridles are attached to the eyes or ears at the top and the bottom, and in the bridle ears at the top on each side two lines attached which lead upward toward the top of the derrick; the photograph does not show where the other ends of these lines are attached, neither does it show how far up into the derrick these lines go; they do not appear to be taut; it is impossible to tell from the photograph whether the weight of the spooler is resting on these two lines, whether they are "hanging" or "safety" lines, or whether such weight is borne by the chains which are attached to the side bridles.

The evidence shows that sometime in July of 1937, Patterson-Ballagh begun to manufacture their second type of spooler; this spooler was of the same general construction as the first, except that it had, in addition to the middle eye, an eye at the top of the spooler, and another in between the top and middle eyes. Mr. Ballagh testified this change was made in response to suggestions received from men in the field as heretofore mentioned.

The first advertisement (Exhibit 25) published by Patterson-Ballagh showing their new spooler appeared October 21, 1937; the cut of the spooler was stipulated by counsel to have been printed upside down in this advertisement, but viewed right side up it shows a taut line extending upward from the middle eye, and no lines attached to either of the two eyes above the middle eye; an advertisement dated December 30, 1937, Exhibit 26 shows the second type of spooler, with a line leading downward from the middle eye, marked "hold down safety line" and a line attached to the top eye marked "hanging line"; a third type of spooler is shown in an advertisement dated November 18, 1938, Exhibit 10-K, this spooler being of a shorter length, with metal arms instead of the bridle ropes, with an eye at the top with attached line labelled "hanging line", no line in the midde eye, and an eye at the bottom with a line marked "hold down safety line". Other advertisements show spoolers with the line in an eye at the top marked "hanging line" under dates of December 1, 1938, April 25, 1940, and such spoolers with the "hanging line" attached to an eye at the top, similarly labelled, appear in Patterson-Ballagh catalogues for 1942, 1944, 1945 and 1947.

Directions for the installation of the spooler in the catalogues stress the importance of lining the hayfork pulleys which

hold the bridle ropes so they are in line with the drilling line, and of lining the spooler up so that its center will be exactly lined up with the hayfork pulleys; the cut of the spooler in the 1947 catalogue shows a line attached to the top eye, while arrows leading from this eye and the eye next below it point to the designation "hanging loops at the center of gravity"; directions for installation state that the hanging line must be high enough so that the frame hangs freely about the drilling line so that there will be no side pull when in operation. "This is important", the directions continue, "If necessary, add to the hanging line, as same must be vertical, if the linings are to show a long life." The catalogue above mentioned also contains a statement to the effect that the Patterson-Ballagh spooler has become standard equipment with most operators, and that "thousands are in service throughout the U. S. A."

The commercial success of this spooler is fully established by the evidence.

Mr. Ballagh further testified that since July of 1937 Patterson-Ballagh Corporation and its successor in interest, Byron Jackson Company have continued to manufacture and sell spoolers similar to Exhibit N, their model in evidence, with an eye at the top; that during the past two years they have been recommending that the spoolers be hung from a line attached to the center of the loop, the loop being formed by a line having each end attached to the eyes or ears at each side of the top of the spooler, as this has been found to be a better method than the hanging line from a single eye at the top.

Defendants in their answer have denied infringement, and have set forth in Paragraphs 13 to 25 inclusive, various affirmative defenses, which, with the exception of that of laches which counsel for defendants withdrew at the trial, have been epitomized by counsel in their brief:

"The defendants rely upon the following defenses which were raised by the answer filed to the supplemental complaint:

"1. That the patent in suit is invalid because nothing is involved other than the exercise of mere mechanical skill and that which was obvious to those skilled in the art.

"2. That the defendant, Patterson-Ballagh Corporation prior to the date of invention of Moss, manufactured and sold wire line controllers embodying the invention of the claims in issue which were publicly used prior to said date of invention in the United States.

"3. That John E. Reed, prior to the date of invention by Moss, conceived the invention of the claims in issue and reduced it to practice and publicly used the same.

"4. That the specifications of the patent and the claims do not comply with the requirements of § 33 of Title 35 of the United States Code.

"5. That the defendants have not infringed the claims in issue.

"6. That the claims in issue were so limited during the prosecution of the application for the Moss patent that the plaintiffs cannot now contend that the claims have such a scope as to cover defendants' structure."

We shall discuss, first, subdivision 4 which relates to the question of whether the specifications and claims comply with the requirements of Section 33 of Title 35 U.S.C.A. Under this category, defendants have criticized the use of the word "substantially" in the Moss patent. It is interesting to note that when defendants' counsel requested of the Patent Office that the Reed application be amended to include claim 23, said claim included the word "substantially" used in the same manner as that of Moss claim 2, and we observe that neither counsel, at that time, nor the Patent Office, when it considered the Moss application, found any uncertainty presented by the use of such word.

 It was said in Bianchi v. Barili, 168 F.2d 793 at page 799, a decision of the Court of Appeals of the 9th Circuit, from which we quote:

"In the first place, considerable latitude in semantics is permitted to an inventor. As was said in H. J. Wheeler Salvage Co. v. Rinelli & Guardino, D.C.N.Y., 295 F. 717, 727, 'a patentee has the right to use

such words as to him best describe his intention, and they will be so construed as to effectuate that result.' "Second, the specification and the claims of a patent are not to be construed with legalistic rigidity. Here, as elsewhere in the law, 'the letter killeth, but the spirit giveth life.' "

In Application of Curley, 158 F.2d 300, at page 304, 34 C.C.P.A. Patents, 749, it was stated that the word substantially is a relative term and "should be interpreted in accordance with the context of the claim in which it is used."

■ We feel that this defense merits little attention. A reading of the Moss patent leaves no doubt that, as required by the statute, the invention has been described so as "to enable any person skilled in the art or science to which it appertains, or with which it is most nearly connected", to make and use the Moss spooler to obtain the results specified.

Contrasted with defendants' contention just discussed is their defense outlined under Subdivision 1, that the Moss invention involved nothing more than the exercise of mechanical skill, and was obvious to those skilled in the art. In support, defendants' counsel in their brief quote portions of the testimony of some of plaintiffs' witnesses, and from such portions counsel would convince us that any practical man in the field would know that a spooler should be "hung from the top." Our recollection of the entire testimony of these witnesses as they spoke from the stand, refreshed by a reading of their entire testimony in the transcript, does not lead us to ascribe to such testimony the meaning which counsel gives it. Their entire testimony leads us to the conclusion that they meant that any practical oil man, now, as of today, would know the spooler would hang better from the top; several of these witnesses testified that they had worked with Patterson-Ballagh spoolers of the early type, and that these spoolers were hung in the middle, and were off balance; we find no instance where anyone of these witnesses testified that he, himself, hung one of the middle-eye spoolers from the top instead of the middle because such a method was obvious to him, as a practical man; and not one of them testified that he had ever seen a spooler hung from an eye or eyes at the top before he saw the Moss spooler.

As further evidence that the Moss method of hanging is obvious, counsel point to the photograph of the Patterson-Ballagh spooler taken in August, 1936, while installed in a well of the Reserve Oil Company near Bakersfield, California. As we have mentioned elsewhere, this photograph does not present conclusive evidence regarding the hanging of the spooler, and neither does the testimony of Mr. Ballagh concerning it, especially in view of the fact that he was evidently confused at the trial as to the difference between hanging lines and safety lines.

Again, on the point that the hanging of the spooler by an eye at the top was obvious to those skilled in the industry, reference is made to Mr. Ballagh's testimony that in 1936 and 1937 he received suggestions from men in the field that the spooler would hang better if it were hung at the top, and two lines used instead of one.

Keeping in mind that less than two dozen of those first middle-eye spoolers were sold during 1936 and 1937, and also noting that no one of the practical men of the field who made these suggestions was produced by the defendants to tell us whether he arrived at this method of hanging because it was obvious, or because he had heard of the Moss invention, disclosed in May of 1936 and tested and subsequently used in April of 1937, we are inclined to discount this hearsay testimony. First if any suggestions were made to Mr. Ballagh in 1936 that his middle-eye spooler was not satisfactory, and should be hung from the top, with two lines, instead of the middle, or that another eye should be added, it would seem reasonable that he would have followed such suggestions in his own application filed in December of 1936, and, secondly, if such suggestions were made to him prior to May 22, 1937, it is logical to suppose that he would have caused the Reed application, which was actually the Ballagh application with the name changed, and under which Ballagh had taken out a license, to be drawn so as to include this

superior method of hanging instead of the middle eye method.

While it would have been simple to give the industry the benefit of these suggestions by changing the Patterson-Ballagh advertisements of the middle eye spooler to direct that the same be hung in the "obvious" method allegedly disclosed by the Reserve Oil Company photograph of August, 1936, we find a complete absence of any mention of this method in the advertising exhibits for the ten years subsequent to the date last cited.

Instead, we note that the Patterson-Ballagh advertisements continued to depict the middle eye with line attached until December of 1937. On that date their "really new wire line guide" with the top eye and the hanging line attached was shown. We note that the latter spooler was manufactured within a few months after, and within 34 miles of the place where the success of the Moss spooler had been demonstrated. All of which would indicate that if suggestions from men in the field led to the addition of the top eye to the Patterson-Ballagh spooler, such suggestions originated not from those who found it obvious, but from those who had seen or heard of the Moss method of hanging at the top.

As offering additional support to the theory that Moss' top eye was obvious, mention is made of the testimony of Reed concerning the old chain spoolers and the wooden and rubber spoolers made by Reed. We do not attach importance to Reed's testimony as to the method of suspension of the old chain spoolers; such testimony was not supported by the other practical man of the oil fields produced by the defendants, Mr. Prehoda; it was contradicted by several of plaintiff's witnesses. It was evident that Prehoda, in his testimony, also became confused between hanging lines and safety lines.

In our opinion the fact that the record of invention made by Reed in April of 1936 contained no mention of a hanging line of any sort, the fact that his application for a patent filed May 22, 1937, contained no mention of a hanging line or lines attached at the top of the spooler, either from one eye, or from ears or eyes at each side of the top, provide a clear refutation of his testimony that he hung his chain spoolers in 1935, his wooden spoolers in 1935, his rubber spoolers in 1936 from lines attached to the top of the spoolers because that was "the normal way to hang anything" to make it hang perpendicularly, instead of hanging it in the middle.

Four patents, the application for the earliest one having been filed in 1923, the Gill, Posey, Bell and Smith patents, were introduced in evidence by defendants to show the state of the art before and at the time of the Moss application. The first three patents disclose no hanging lines, and the file wrappers of the Moss and Reed patents show that these patents were considered by the Patent Office with reference to both applications. The Smith patent was stressed as supporting the point that the Moss invention was obvious and constituted merely an exercise of mechanical skill. The latter patent, application for which was filed January 4, 1937, was not pleaded in anticipation of the Moss patent, and we see no similarity between the respective devices, except that the Smith device, as well as the Reed device, and the Moss device, each has a hanging line or lines.

The patents introduced as above mentioned serve only to indicate the attempts of those skilled in the art to create a device which Moss succeeded in perfecting.

We are indebted to a recent decision of the Court of Appeals for the 9th Circuit, R. W. Pointer v. Six Wheel Corporation, decided September 27, 1949, reported at 177 F.2d 153, 159, for an illuminating discussion on the question of novelty as opposed to that which is produced by a mere exercise of mechanical skill. The opinion, written by District Judge Leon R. Yankwich, also contains citations of many cases which likewise assist us in considering the problem before us.

██ It is stated in the R. W. Pointer case just mentioned that whether there is invention is a question of fact, and that so is the determination of the question whether there is presented some uncommon advance in the art or mere exercise of "the skill of the calling."

■ To guide the Court in deciding these questions of fact, the reported decisions have suggested various weights which may be laid upon the scales; not the least important of these is the heavy burden which is borne by one attacking the validity of the patent, especially one who has offered contest of that patent in the Patent Office. Radio Corp. v. Radio Engineering Laboratories, 293 U.S. 1, 7–8, 54 S.Ct. 752, 78 L.Ed. 1453; Morgan v. Daniels, 153 U.S. 120, 125, 14 S.Ct. 772, 38 L.Ed. 657.

We have no testimony as to the number of years that the difficulties cured by the Moss patent had persisted to plague the oil drilling industry prior to the experience of the various witnesses, but the DePeel patent, referred to in the Moss file by the Patent Office as prior art, was granted in 1913. References in the Moss and Reed files, to prior patents, as well as the testimony at the trial shows that much effort had been expended by others in the direction taken by Moss, and that such effort was not productive of satisfactory results. There is evidence that while the spoolers in use prior to the construction of the top eye spooler were of some value in partially stopping the whip of the line, the evidence also is clear that they did not succeed completely in this regard, and their use resulted in great wear on bearings and drilling lines; that the Moss and Patterson-Ballagh top eye spoolers were the first spoolers to stop the whip of the line, and to insure proper spooling with very little wear on the line and bearings. The Patterson-Ballagh top eye spoolers are shown by the evidence to be in use in the majority of oil well drilling operations and to be practically standard equipment for such work. ·

■ That the Moss method of hanging might now appear obvious to those who have seen it, is to be expected; in fact, one of the practical men of the oil field testified that after he saw the Moss spooler, he couldn't understand why he, himself, didn't think of it before. It was stated in Ray-O-Vac v. Goodyear Tire and Rubber Co., D.C., 45 F.Supp. 927, at page 931, affirmed, 7 Cir., 136 F.2d 159: "If a particular result has long been desired and frequently sought but never attained, ordinarily we may not attribute lack of invention to the device which first achieved the desired result, because it seems that the simplicity of the means is so marked that many believe they could readily have produced it if required. The Barbed Wire Patent (Washburn & Moen Mfg. Co. v. Beat 'Em All Barbed-Wire Co.), 143 U.S. 275, 284, 12 S.Ct. 443, 36 L.Ed. 154. Though the device be simple, and it may seem strange that earlier makers should have failed to take the final step needed to convert their experiments into assured success, the simplicity will not preclude invention. Carnegie Steel Co. v. Cambria Iron Co., 185 U.S. 403, 22 S.Ct. 698, 46 L.Ed. 968. (citing other cases). * * * " See also: Diamond Rubber Co. v. Consolidated Tire Co., 220 U.S. 428, 434, 31 S.Ct. 444, 55 L.Ed. 527.

■ Paraphrasing some of the language of Judge Learned Hand in Safety Car Heating & Lighting Co. v. General Electric Co., 2 Cir., 155 F.2d 937, 939, also cited in the R. W. Pointer case, supra, we have considered "the circumstances which preceded, attended and succeeded the appearance of the invention", "the length of time the art, though needing the invention, went without it", "the number of those who sought to meet the need, and the period over which their efforts were spread" and the "extent to which it superseded what had gone before", and find, as did the Patent Office after its careful consideration, that the Moss device shows invention. See also: Paramount Publix Corp. v. American Tri Ergon Corp., 294 U.S. 464, 474, 55 S.Ct. 449, 79 L.Ed. 997; Schering Corp. v. Gilbert, 2 Cir., 153 F.2d 428, 432.

Subdivision 2 of the synopsis of affirmative defenses mentions that Patterson-Ballagh Corporation, prior to the date of invention of Moss, manufactured and sold wire line controllers embodying the invention of the claims in issue, and that such devices were publicly used in the United States prior to said date of invention.

There is no contention that Patterson-Ballagh manufactured any spooler earlier than June, 1936, or, possibly, just prior to the date of the photograph, Exhibit H;

this spooler, shown in the Reed patent, was the middle eye spooler and did not embody the hanging eye at the top shown by the Moss claims in suit. But counsel for defendants insist that the 1936 spooler just mentioned, when hung from the two top bridle ears embodied the invention of the claims in suit, and that such use was shown by the testimony in connection with the Reserve Oil Company photograph, Exhibit K.

We have analyzed the testimony with reference to this exhibit in our discussion on invention, and the conclusions there reached make it unneccessary to accord further attention to this defense.

Under Subdivision 3 of their synopsis of defenses, counsel for defendants have referred to the allegation in their answer at Paragraph 17, which is to the effect that the Moss patent, particularly claims 2 and 7 is invalid because John E. Reed, prior to the date of Moss' invention, conceived the invention thereof and manufactured and caused to be used a line spooler on the Belridge No. 20 Union Oil Well, on or about April 15, 1936, which line spooler embodied the construction as claimed in said Moss patent, and particularly claims 2 and 7 thereof.

The earliest date which the evidence discloses Reed used a spooler on the Belridge No. 20 well was June or July, 1936; the testimony is that this spooler was not entirely successful in taking the whip out of the line, was used only until August, at which time Reed constructed his second type of spooler (with the hanging line going over a pulley, and a weight at the end of the line outside the derrick), which latter spooler was used on another well in August, 1936, and sometime later in the year, on a re-deepening job on Belridge 20.

Counsel for the defendants in their brief characterize the Reed record of invention of April 15, 1936, as a "conception" and the making of the spoolers used on the Belridge No. 20 well in June or July of 1936 and thereafter during 1936 as a reduction to practice of such conception.

In our discussion on the question of invention, we have given our appraisal of the testimony with regard to the hanging, by Reed, of his spoolers used on Belridge No. 20. As we have heretofore stated, no hanging line of any sort was shown in Reed's record of invention; and whatever the position of attachment of the hanging line or lines on Reed's spoolers above mentioned, such feature cannot be connected up as a reduction to practice of any conception evidenced by the record of invention, nor, for that matter, can the Reed application or patent as far as the hanging line thereof, be connected with said record of invention.

In connection with Subdivisions 2 and 3 of the synopsis, counsel for defendants assert that the earliest date of invention which Moss can claim is April 5, 1937, the date of actual reduction to practice, and that should he seek to carry his date of invention back to his date of conception on May 16, 1936, he would be barred because of a failure to exercise due diligence during that period.

The oft-cited case of Automatic Weighing Machine Co. v. Pneumatic Scale Corp., 1 Cir., 166 F. 288 is quoted as authority on this point; counsel for plaintiffs, referring to "Interference Law and Practice by Rivise and Caesar, (1940)", Volume 1, chapter XIII, page 537, maintain that the question of diligence is important only in the case of a party who was first to conceive the invention but who did not reduce it to practice until after his opponent had done so. In Hann v. Venetian Blind Corporation, 111 F.2d 455, 459, the opinion of the Court of Appeals, 9th Circuit, quotes from the Automatic Weighing Machine Co. case, in connection with the statement: "We are not unmindful of the rule that where two parties have reduced an invention to practice, the one who first conceived and disclosed the invention and with reasonable diligence connected his conception with its reduction to practice is the 'original and first inventor' under the statutes, without regard to which of the two first completed the reduction to practice."

We are inclined to agree with counsel for the plaintiffs that the question of diligence

is not important here because no evidence has been introduced in this case to show any race between rival inventors, but since counsel for defendants have asked for a finding on this subject, we will consider the same.

Conception is defined in Townsend v. Smith, 36 F.2d 292, 295, 17 C.C.P.A., Patents, 647, as being established "when the invention is made sufficiently plain to enable those skilled in the art to understand it." See also Cooper v. Hubbell, 53 F.2d 1072, 1077, 19 C.C.P.A., Patents, 790.

Reduction to practice is defined in Hann v. Venetian Blind Corporation, 9 Cir., 111 F.2d 455, 458 as being accomplished when a "machine * * * is assembled, adjusted and used."

Counsel seem to agree that the date of Moss' conception was May 16, 1936, when he disclosed his invention to Anderson, and we so find. The evidence is also clear that Moss completed the construction of his spooler in November, 1936, except that he had not fully decided at that time whether he would use rubber or wood for bearings; that between November of 1936 and April 5, 1937, he inserted rubber bearings, arranged for a test of his device, procured and took to the well of the Holly Oil Company in Huntington Beach, California, the ropes, pulleys and counterweights used in operating his completed device.

As was said in Powell v. Poupitch, 167 F.2d 514, 518, 35 C.C.P.A., Patents, 1080. "The question of diligence is one which must be determined by consideration of the particular circumstances of each individual case." We are also of the opinion that the circumstances of the particular individual may be considered with reference to this question.

In Moss' case, he was a driller employed on the rig. He did not have the authority of Reed, drilling superintendent for the Union Oil Company, or Anderson, in charge of production for the Holly Oil Company. The drilling for oil is an industry wherein mistakes are costly, and it is not to be supposed that a test of a new device in connection with the drilling cable would be undertaken without the sanction of those in charge of such operations. Moss held no position entitling him to insist that his device be tested, and it was important that the test be undertaken by someone he could trust, who would give him a "fair deal." His first test was secured through the person to whom he had made his first disclosure. Under all the circumstances, we find no lack of diligence in his conduct.

Directed to their defense set forth in Subdivision 5 of their synopsis of defenses, that of non-infringement, defendants introduced evidence "directed to the proposition that Patterson-Ballagh spoolers were not hung so that the angle of inclination allowed the line to pass freely through the spooler, as it would be normally hung." Mr. Hambley, patent attorney of defendants, computed the angles of inclination of the three sizes of defendants' spoolers. He stated that the angle of inclination of the Patterson-Ballagh spooler, when suspended from a line attached to the top eye and fastened thirty feet above the spooler in the derrick was, for the four section spooler, 14 degrees off the vertical, or 10 degrees offset from the drilling line, the six section spooler, 9 degrees off the verticle, or 5 degrees offset from the drilling line, and the two section spooler, 30 degrees off the vertical or 26 degrees offset from the drilling line. Counsel for defendants argue that the degree of inclination from the drilling line as to each of these spoolers is too great to permit the drilling line to run freely through it, and maintained that the defendants do not infringe "because they do not so hang their spoolers so that there is no friction on the line."

It is further argued that Mr. Moss testified that his spooler has an angle of inclination two or three degrees offset from that of the drilling line, and that if the claims in suit are interpreted so that the words "a suspension means connected with said body at a point eccentric to the major axis and adjacent to one end of the body to support the body in *normal position* with the bore *substantially parrallel* and contiguous to the line for reception thereof"

(emphasis supplied) mean that the spooler is suspended so as to hang at no greater angle of inclination than two or three degrees offset from the drilling line, then none of the spoolers manufactured by the defendants infringe.

It was further testified by Mr. Hambley that a Patterson-Ballagh spooler hung in the derrick by a hanging line attached to the top of a loop each end of which was fastened to the two top ears of the spooler had no angle of inclination, but was vertical, and thus, figuring the slant of the drilling line as 4 degrees, the spooler was offset only 4 degrees from the drilling line.

It was argued by counsel for defendants that if "substantially" as used in the Moss claims meant an offset from the drilling line greater than the 2 or 3 degrees mentioned by Mr. Moss, then such a spooler would be covered by the method of hanging shown in the Smith patent and the Reserve Oil Company photograph, Exhibit K, and the claims would thus be invalid.

We have already commented upon the Smith patent and the Reserve Oil Company photograph in our discussion on validity.

There was also some argument between counsel for the parties as to the meaning of the words "normal position." Mr. Hambley interpreted "normal position" to mean the position the spooler naturally assumes when freely suspended without any line passing through the bore or any restraining force acting on it other than gravity; counsel for defendants ascribed a similar meaning, counsel for plaintiffs stated that when hanging line was attached to the top eye, and the spooler tied up to such a girt as to make the bore substantially parallel with the line, a "normal position" as nearly as could be gotten would be achieved. We note that the Patent office, in refusing the Reed amendment, stated that one of Moss' objects was to provide a spooler which in its "normal *working* position" forms a guide along the axis of the cable so that the cable may run quite free from bearing contact pressure. (Emphasis supplied.)

There are several reasons why we feel that Mr. Hambley's testimony is not pertinent to the issues before us. We are unable to reconcile the factors which Mr. Hambley used to obtain his angles of 5, 10 and 26 degrees with the statements of Mr. Moss as to the manner in which he obtained his angle of 2 or 3 degrees. Mr. Hambley assumed a 30 feet hanging line, and a drilling line with a slant of 4 degrees off the vertical. Mr. Moss testified that the hanging line would be 30 or 40 feet long depending upon the position of the drum, and reiterated several times his statement that the hanging line must be placed "high enough so it will hang as near as it will hang" to the inclination of the drilling line; also the evidence is not clear that Mr. Moss meant that the angle of 2 to 3 degrees was present when the spooler was hung from the hanging line without the bridle ropes and pulleys, or was present when the spooler was in actual "working" position.

Even if we accept Mr. Hambley's computations as correct, we must label them as inconclusive; they were, to borrow a phrase from Weiss v. R. Hoe & Co., 109 F.2d 722, at page 726, in the nature of "ex parte tests" not made when the devices were in operation, nor in fact, in actual "working" position.

Mr. Hambley further testified (Tr. 465) "* * * the normal angular tilt of the axis of the spooler is so that, when you locate that eye with respect to the axis, and when you determine what length the spooler is going to be, at that instant you have determined what its normal suspended position will be and it doesn't matter one bit how high up you go * * * you can't change the normal suspended position of that spooler by attaching it at a higher or lower point in the derrick. That is determined by the dimensions of the spooler when it is manufactured."

This testimony seems to be at variance with the emphasis placed by Patterson-Ballagh directions on hanging their spooler as shown in their catalogues, particularly their 1947 one: "Fasten the hanging line to the exact center of one of the upper girts, (generally 30–40 feet above the third girt) high enough so that the frame hangs freely about the drilling line. Be sure

there will be no side pull on the guide when put into operation. *This is important.* (Emphasis found.) If necessary, add to the hanging line, as same must be vertical if linings are to show a long life."

Also in constrast with the language of these directions, and with the claims in the Patterson-Ballagh advertisements of a "freely hanging guide" are the statements of counsel for defendants during the trial that the degree of inclination of each of the Patterson-Ballagh spoolers is too great to permit the drilling line to run freely through it, and that defendants "do not hang their spoolers so that there is no friction on the line."

In Eibel Process Co. v. Minnesota & Ontario Paper Co. 261 U.S. 46, 43 S.Ct. 322, 67 L.Ed. 523, the Supreme Court considered the effect of the use of the word "substantially", and in said case expounded many principles of patent law which are pertinent to the case at bar on the question of infringement and also upon validity. In the Eibel patent, the object of the invention was "to construct and arrange the machine whereby it may be run at a very much higher speed than heretofore and produce a more uniform sheet of paper which is strong, even and well formed", and the device was described as being an improvement on the Fourdrinier machine; invention, according to the specifications, consisted in causing the paper stock to travel by gravity in the direction of the movement of the making-wire and approximately as fast as the making-wire moved. "To accomplish this result in a simple manner", read the specifications, "the breast roll end of the paper-making wire is maintained at a substantial elevation above the level, thereby providing a continuous downwardly moving paper-making wire * * *".

Some of the claims in question used the words "substantial elevation". The Supreme Court in its opinion 261 U.S. at page 58, 43 S.Ct. at page 327, 67 L.Ed. 523, referred to the fact that the prior art showed a three inch elevation of the breast roll, and its sole purpose was drainage. On the question of invention, the Court commented that while some of the witnesses testified that they had used or seen used elevations of four, five or six inches, that written records showed no more than three inches. The Court remarked that "the amount of elevation rested in memory running back more than 10 or 15 years, a memory stimulated by the subsequent high pitches of Eibel and the retrospect of the progress that now seems so easy and clear to everyone. * * *" Continuing, 261 U.S. at page 60, 43 S.Ct. at page 327, 67 L.Ed. 523, it was stated: "* * * The temptation to remember in such cases and the ease with which honest witnesses can convince themselves after many years of having had a conception at the basis of a valuable patent, are well known in this branch of law, and have properly led to a rule that evidence to prove prior discovery must be clear and satisfactory. * * *"

Mention was also made in this decision, 261 U.S. at page 65, 43 S.Ct. at page 329, 67 L.Ed. 523, of the question whether or not the patent was too vague in its terms because the extent of the factor of pitch was not defined except by the terms "substantial" and "high"; the Court noted that the figure accompanying the specification and illustrating the improvement indicated an angle of four percent, or an elevation of 12 inches, and stated that the reference to the small elevations in prior patents for drainage purposes only indicated that the patentee had in mind elevations substantial as compared with them in order to achieve his purpose of substantially increasing the speed of the stock; that it was difficult for him to be more definite due to the varying conditions of speed and stock existing in the operations of the Fourdrinier machines, and the necessary variation in the pitch to be used to accomplish the purpose of his invention.

The defendant used a Fourdrinier machine having the breast roll at an elevation of 15 inches above the level, and such machine caused the paper to move rapidly in the direction of the movement of the wire and at a speed approximately equal to the speed of the wire "substantially as described" in plaintiff's patent. The Court held that Eibel's patent was valid, and infringed.

In Robins v. Wettlaufer, 81 F.2d 882, at page 884, 23 C.C.P.A., Patents, 952, the question was whether a screening machine with its drive shaft over 7 inches away from the center of gravity came within the claim which read in part: "A screening apparatus comprising a screen frame, a drive shaft substantially coincident with the center of gravity * * *."

The drive shaft of the other device being considered was one-half inch away from the center of gravity. The Court, reading the specifications, commented that the primary conception of both parties was to construct a single actuating shaft screen which would be evenly balanced and free from destructive and noisy vibrations, which was to be accomplished by a combination of features including the drive shaft, and that the location of the drive shaft must be considered in connection with the other elements of the invention. Deciding in favor of the first mentioned machine, the Court stated that the same had successfully operated to produce the new and useful results of the subject matter of the counts of the interference, and that it satisfied the same, and that the element in issue contributed to that result, holding, 81 F.2d at page 893, 23 C.C.P.A., Patents, 952: "If the actuating shaft be close enough to the center of gravity of the frame so that the objects of the invention are accomplished and its proposed new and useful results attained, then the shaft may be held to be 'substantially coincident' with the center of gravity."

See also: Valvona-Marchiony Co. v. Marchiony, D.C., 207 F. 380, Engineer Co. v. Hotel Astor et al., D.C., 226 F. 779, 780, Pittsburgh Iron & Steel Foundries v. Seaman-Sleeth Co., D.C., 236 F. 756, Hazeltine Corporation et al. v. A. H. Grebe & Co., Inc., D.C., 21 F.2d 643, 645, which are to the effect that the word "substantial" should be interpreted in the light of the results sought and accomplished.

It is admitted by defendants that all elements of their device are identical with those of the Moss patent except the eye at the top for the hanging line.

It is our opinion that there is also identity in that respect.

It is certain that the eye at the top of defendants' device is placed so as to accomplish the objects of the Moss patent, and to attain the proposed new and useful results claimed by the Moss patent; it is likewise certain that defendants' spooler hangs with its bore "substantially parallel and contiguous to the line for reception thereof" and it is also certain that the Patterson-Ballagh spooler operates "substantially without load of the body on the line when this is in a vertical plane transverse to the axis of the draw works drum."

Viewing the defendants' device and its results with the claims in suit and the results claimed by the patent, we are inclined to feel that the controversy over the word "substantial" in this case makes most apropos the language used by the Court in Bianchi v. Barili, 9 Cir., 168 F.2d 793, at page 801: "* * * infringement is a question of fact. * * * It is also a question of substance, and not of nomenclature. It is not to be settled by striving to ascertain the difference between tweedledum and tweedledee."

In Union Paper Bag Machine Co. v. Murphy, 97 U.S. 120, 125, it was stated: "* * * the correct rule being that, in determining the question of infringement, the court or jury, as the case may be are not to judge about similarities or differences by the name of things, but are to look at the machines or their several devices or elements in the light of what they do, or what office or function they perform, and how they perform it, and to find that one thing is substantially the same as another, if it performs substantially the same function in substantially the same way to obtain the same result, always bearing in mind that devices in a patented machine are different in the sense of the patent law when they perform different functions or in a different way, or produce a substantially different result." See also. Saco-Lowell Shops v. Reynolds, 4 Cir., 141 F.2d 587.

Under Subdivision 6 of their summary of defenses is defendants' contention that the claims in issue were so limited during the prosecution of the same before the Patent office that they cannot now be said

to cover defendants' structure. Under this heading it is argued that the Moss claims should have the limited interpretation that the spooler must coincide with the angle of inclination of the wire line with not more than 2 or 3 degrees deviation.

We find no merit in this contention.

■ It is our opinion that Claim 2 of the Moss patent is valid, and is infringed by the devices which have been, and are being manufactured by defendants.

With reference to Claim 7 of the Moss patent, we find that it is valid, and is infringed except as to the band parts. Counsel on either side have not devoted enough attention in presenting evidence, argument or authorities on this feature to justify our discussing the same in detail. We think that plaintiffs are entitled. to the benefit of the presumption of validity afforded by their patent, Morgan v. Daniels, 153 U.S. 120, 123, 14 S.Ct. 772, 38 L.Ed. 657, which defendants have not overcome. On the other hand, plaintiffs have not sustained their burden to prove that as to these parts, defendants have infringed. Price v. Kelly, 154 U.S. 669, 14 S.Ct. 1208, 26 L.Ed. 634.

Plaintiffs should have judgment for an injunction, accounting, damages, interest and attorney's fees.

We have not been furnished with sufficient points and authorities or discussion by counsel to enable us to decide at this time whether damages for wilful infringement should also be awarded, and suggest that counsel for plaintiffs prepare findings, etc., in the light of this opinion, leaving open the finding on the last mentioned subject, and submit the same in accordance with the rules of this Court, within 20 days from this date. In the meantime, counsel for the parties may file further briefs and written argument on the question of wilful infringement if they so desire, within ten days from date hereof. Also within ten days from date hereof counsel for plaintiffs should submit detailed statements of work done referable to the amount to be awarded as attorneys' fees.